[S.F. No. 24122. June 30, 1980.]

MIKE KINNEY et al., Plaintiffs and Appellants, v.
ELMER VACCARI, SR., Defendant and Appellant.

350

COUNSEL

Albert G. Rizzo, Jr., and Harry A. Allen for Plaintiffs and Appellants.

Tim Birnie for Defendant and Appellant.

OPINION

**MOSK, J.**—This is an action for injunctive relief and damages brought by a group of tenants against their landlord, Elmer Vaccari, Sr. (Senior) and his son and managing agent, Elmer Vaccari, Jr. (Junior). Plaintiffs are sixteen tenants, including seven minor children, who resided in six rental units let to them by defendants. Plaintiffs occupied their units under month-to-month tenancies; the rent included all gas, water and electricity used therein.

In mid-January 1974, Junior told plaintiffs on several occasions that he intended to "throw the bums out" and would turn off gas service on February 1 in order to force plaintiffs to move. Although Junior had received some $925 in rental payments in the month of January, he failed to pay an outstanding gas bill of $492.11, knowing this would result in termination of plaintiffs' service. On February 1, a representative of the gas company visited the premises and turned off the gas supply that provided cooking and heating for plaintiffs' homes. Despite plaintiffs' repeated attempts to tender payment of their February and March rents so that the utility bill could be paid, Junior rejected all such payments; the gas bill went unpaid until March 22, and service was not restored until April 1. On February 5, plaintiffs failed an action seeking injunctive relief to restore their gas service, as well as damages pursuant to section 789.3 of the Civil Code.[1]

After making findings of fact as recited above, the court, sitting without a jury, concluded that Junior had willfully and maliciously caused the gas service to be terminated for a period of 60 days, and that by operation of the doctrine of respondeat superior, liability for the acts of Junior was imputed to Senior. Judgment was entered against both defendants for compensatory damages in the sum of $7,901, for penalties under section 789.3 of $36,000, for attorney's fees of $5,600, and against Junior alone for punitive damages of $1,750. Senior appeals, asserting that section 789.3 is unconstitutional as applied in the present case, focusing on the $100-a-day penalty provision in subdivision (b)(2). Plaintiffs filed a cross-appeal, challenging the trial court's interpretation of the term "tenant" as used in the penalty formula of section 789.3.

---

[1]Unless otherwise noted, all statutory references herein are to the Civil Code.

The judgment can be sustained only if it satisfies the statutory requisites of section 789.3. At all times herein the section read as follows:

"(a) A landlord shall not with intent to terminate the occupancy under any lease or other tenancy or estate at will, however created, of property used by a tenant as his residence willfully cause, directly or indirectly, the interruption or termination of any utility service furnished the tenant, including, but not limited to, water, heat, light, electricity, gas, telephone, elevator, or refrigeration, whether or not the utility service is under the control of the landlord. [¶] (b) Any landlord who violates this section shall be liable to the tenant in a civil action for all of the following: [¶] (1) Actual damages of the tenant. [¶] (2) One hundred dollars ($100) for each day or part thereof the tenant is deprived of utility service. [¶] (c) In any action under subdivision (b), the court shall award reasonable attorney's fees to the prevailing party." Thus a landlord violates the statute only when he willfully interrupts a tenant's utility service with the intent to terminate occupancy.

Satisfaction of the textual requirements of section 789.3, however, does not ensure that a judgment awarded thereunder is proper in every case. In *Hale* v. *Morgan* (1978) 22 Cal.3d 388, 397, 404 [149 Cal.Rptr. 375, 584 P.2d 512], we declared that "section 789.3 permits the assessment of arbitrary, excessive and unreasonable penalties" and in certain situations the imposition of the $100 daily penalty can be "'clearly, positively, and unmistakably' unconstitutional." As will appear, the present action is not such a case.

In *Hale*, this court considered the constitutionality of a penalty assessed under section 789.3. We first noted that the Legislature may constitutionally impose reasonable penalties to secure obedience to statutes enacted under the police power, so long as those enactments are procedurally fair and reasonably related to a proper legislative goal. (*Id.* at p. 398.) Yet we determined that the statutory penalty could be unconstitutional in certain instances because it was mandatory in amount and potentially unlimited in duration. (*Id.* at p. 399.) We noted the absence of any discretion in the trier of fact, and observed that a uniform penalty must be assessed even though the statute applied to a broad spectrum of culpable conduct with an equally divergent range of resulting injury. We also recognized that both landlords and tenants can vary significantly in sophistication and financial strength, and expressed concern that a shrewd tenant could, through inaction, convert "the single

wrongful act of [the landlord] into a veritable financial bonanza." (*Id.* at p. 403.) Thus, we held, as applied to the facts of that case, that the statutory penalty provided in section 789.3 violated the process of law.

The facts in *Hale* differed substantially from those shown here. In *Hale*, the landlord, a resident of the San Francisco area, owned and operated a small mobilehome park in South Lake Tahoe. In February 1975, Hale moved his 35-foot mobilehome into the park without the knowledge or consent of the landlord. After the parties ultimately agreed on a rental fee of $65 per month, which included water and garbage service but not electricity, Hale failed to make any rental payments for three months. The landlord disconnected the water and electricity lines in late May, and utility service was thereby interrupted until November of the same year. Over that period, Hale lived alternately in the mobilehome and elsewhere.

Hale sued the landlord and received a judgment of $17,300 under section 789.3. In reversing the judgment, we noted that the landlord's conduct in terminating the utilities, although provoked, was hardly exemplary, and was subject to censure and justified sanctions. Nevertheless, we were of the view that "under all of the circumstances of this case the *amount* of the penalties is constitutionally excessive," and that "Such a confiscatory result is wholly disproportionate to any discernible and legitimate legislative goal, and is so clearly unfair that it cannot be sustained." (22 Cal.3d at p. 405.)

An equally notable aspect of the *Hale* opinion, however, is its recognition that in the proper factual context application of the penalty formula of section 789.3 could withstand constitutional challenge: "The imposition of the $100 daily penalty over a limited period may indeed, in a given case, be a perfectly legitimate means of encouraging compliance with law. Furthermore, there are doubtless some situations in which very large punitive assessments are both proportioned to the landlord's misconduct and necessary to achieve the penalty's deterrent purposes." (*Id.* at p. 404.) ■ We are faced here with such a case; indeed, if the penalty provided in section 789.3 is not justified under these circumstances, it is difficult to conceive of a case in which it would be applicable.

The distinctions between this case and *Hale* begin with the landlord's apparent motivations for his actions. ■ ■ ■ Here, unlike Hale,

the landlord had little or no provocation for his conduct;[2] some of the plaintiffs were tenants of long standing, having lived in the units for several years. ▇ Although two tenants were in arrears when the utilities were terminated, the total amount of rental payments received in January was nearly twice that owed to the gas company. Furthermore, of the $925 then collected, some $300 was diverted by Junior for his personal use. There was also undisputed testimony at trial that Junior had informed at least one tenant that he would reinstate utility service if this lawsuit was dropped. Thus it is clear that Junior's failure to pay the utility bill was not occasioned by lack of funds, but rather by his determination to terminate plaintiffs' occupancy. Also, in addition to the gas service Junior disconnected the electrical service to plaintiffs' premises, temporarily depriving them of that utility as well.[3]

A more significant distinction between the two cases lies in the tenants' efforts to mitigate damages. In *Hale*, the plaintiff apparently did nothing until he filed his action for section 789.3 penalties more than eight weeks after the utilities were terminated. The circumstances here are materially different. Apprehensive that Junior might terminate the utilities on the first of February, plaintiffs repeatedly tendered their February and March rent payments before, on, and after the day they were due. On each occasion, Junior refused to accept payment. Furthermore, plaintiffs did everything in their power to immediately restore the utilities: they succeeded in reinstating electrical service within a day of its termination, and although they could not reestablish gas service because of the gas company's removal of a section of pipe, they

[2]Although Senior was the actual landlord and Junior was his agent, the trial court held Senior liable for Junior's acts within the scope of his employment under the doctrine of respondeat superior. Thus, for simplicity, the term "landlord" will be used herein to refer to Junior as well as Senior. Senior's contention that the trial court erred in finding Junior's acts were within the scope of his employment is without merit. It is well established that the test for determining if a particular act was in the course of an agent's employment is "whether the act was done in the prosecution of the business in which the servant was employed to assist." (*Chamberlain* v. *California Edison Co.* (1914) 167 Cal. 500, 506 [140 P. 25]; see also Civ. Code, § 2338.) Junior's acts clearly meet this test.

In any event, in its written opinion the trial court also recited that it was satisfied from the evidence that Senior's subsequent conduct in this case constituted a ratification of any acts of Junior that may have exceeded the scope of his employment. (Civ. Code, § 2307; *Rakestraw* v. *Rodrigues* (1972) 8 Cal.3d 67, 73 [104 Cal.Rptr. 57, 500 P.2d 1401].)

[3]Uncontroverted evidence at trial showed that the electrical wiring leading to some of plaintiffs' units had been clipped, and that service to the remaining plaintiffs was interrupted by locking a power switch in the off position. Neither electrical nor gas service to Junior's adjacent residence was interrupted.

immediately contacted the utility to ascertain if defendants were truly in arrears. The gas company refused to divulge this information.

As a result of their inability to reestablish gas service, plaintiffs filed this action and sought a temporary restraining order on February 5, less than a week after service was terminated. Despite numerous admonitions to defendants—e.g., the February 5 issuance of the temporary restraining order, a judicial admonition in open court on March 6 that service should be restored at once, and the issuance of a preliminary injunction on March 15 directing defendants to reinstate and maintain utility service to plaintiffs' units—the gas bill was not paid until March 22, and service was not restored until April 1.[4] Thus it is clear that any concern, as in *Hale*, that plaintiffs "ambush[ed] an unknowing landlord, converting the single wrongful act of the latter into a veritable financial bonanza" is misplaced here.

Yet a third distinction between the two cases lies in the egregious nature of the landlord's conduct. In *Hale* the plaintiff was an uninvited adult tenant who had failed to pay rent for three months. The landlord terminated his utilities in the late spring; the utilities remained off through the summer, in part because of the tenant's apathy and absence. Here, the utilities were terminated during extremely harsh winter weather, causing plaintiffs' poorly insulated homes to be without adequate heating and cooking facilities. As gas service was required for the operation of the water heaters, plaintiffs were also without hot water for the entire 60 days. Furthermore, seven of the sixteen plaintiffs were minor children, and one plaintiff gave birth to another child on February 21. There was uncontested evidence at trial that many of these children, including the newborn infant, became ill as a result of the extreme cold.

Despite defendants' knowledge of these conditions, and plaintiffs' repeated tenders of their February and March rents, and notwithstanding the foregoing judicial directives, defendants continually refused to restore gas service to plaintiffs' homes, thereby perpetuating plaintiffs' discomfort, inconvenience and hardship. Thus, although the conduct of

---

[4] It is evident that plaintiffs were "deprived" of utility service, as required by section 789.3, for the entire 60 days. "[S]tatutory penalties accrue so long, but only so long, as the tenant lacks practical access to any residential utility because the landlord has terminated service. If, for example, the tenant actually succeeds in restoring service, or, by reasonable effort, could have done so, he cannot thereafter be considered to have been 'deprived' of it." (*Hale* v. *Morgan, supra*, 22 Cal.3d at p. 406.)

the landlord in *Hale* was not beyond reproach, by comparison it was far less reprehensible than that of the defendants here.

The record contains other evidence that justifies the penalties assessed. For example, there was uncontested testimony from several witnesses that Junior was frequently intoxicated[5] and verbally abused the plaintiffs with curses and threats at all hours of the day and night. This activity apparently heightened in the final two weeks of January when he made public threats to terminate the utilities in order to "throw the bums out." After the utilities were cut off, Junior often suggested that he might accept plaintiffs' rental payments on the following day, implying that utility service might soon be restored. These repeated representations support the trial court's determination that plaintiffs' continued occupancy of the units for 60 days was not unreasonable.

Thus, we conclude that the punitive assessments imposed by the trial court here are "both proportioned to the landlord's misconduct and necessary to achieve the penalty's deterrent purposes" (*Hale* v. *Morgan, supra,* 22 Cal.3d at p. 404), and are not constitutionally excessive.[6]

[5]As if to corroborate the testimony, Junior arrived in court around 10 a.m. the second day of trial in an inebriated condition. Unable to testify coherently, he was ordered out of the court with an admonition to sober up.

[6]Senior contends the judgment is confiscatory in that it exceeds the value of the premises at the time in question. He failed, however, to introduce any evidence of that value at trial. Moreover, we note that the monthly rental receipts exceeded $1,000. In view of this rate of return, like the trial court we cannot conclude the penalty is confiscatory.

We also note that in its 1979 session the Legislature substantially rewrote section 789.3 in a number of respects. First, the revision added three further acts that landlords are prohibited from doing with the intent to evict, to wit, changing locks on the rented premises, removing its doors or windows, and removing the tenant's personal property or furnishings. The revision also modified the penalty from $100 a day to "An amount not to exceed" $100 a day; it directed the trial court to consider proof of "such matters as justice may require" in fixing the penalty; and it decreed that in no event shall the penalty be less than $250 for each cause of action, that each subsequent violation shall constitute a separate cause of action subject to a further penalty, and that in addition to the statutory penalty the tenant has the right to apply for an injunction and any other remedy he may have by law.

In the circumstances of this appeal, however, we are not required to determine the relevance if any of this change in the law. (Compare *In re Estrada* (1965) 63 Cal.2d 740 [48 Cal.Rptr. 172, 408 P.2d 948].) The statute amending section 789.3 was approved and filed on July 27, 1979. (Stats. 1979, ch. 333, p. —.) It was published in the advance legislative services in September 1979, and took effect on January 1, 1980. Yet at no time after the statute was enacted did the appellant herein call it to the attention of either the Court of Appeal or this court by letter or brief; rather, he mentioned it for the first time in oral argument before us on May 6, 1980. Indeed, even then appellant did not contend that the change in the law should affect the outcome of this appeal; instead, he merely reiterated his claim that the amount of the penalty herein was constitutionally excessive under *Hale*. An appellate court is not required to consider

Senior also contends he was denied a fair hearing because the trial judge found certain financial evidence—Junior's ledger book—to be unreliable even though he had ruled at trial that corroboration of the unchallenged evidence was unnecessary. In its memorandum of opinion the court declared the ledger to be "inaccurate and unworthy of credence." ■ It should first be noted that such a memorandum merely sets forth the court's tentative decision and reasons therefor; it is not controlling and not appealable. (*Estate of Pieper* (1964) 224 Cal. App.2d 670, 675 [37 Cal.Rptr. 46].) At the request of defendants, the court subsequently made formal findings of fact and conclusions of law and entered its judgment based thereon. The findings made no mention of Junior's ledger; it appears therefore that the credibility of its entries was not a factor in the court's judgment. In any event, the ledger is of little evidentiary value since it is relevant only to Junior's financial position, and it is undisputed that plaintiffs were at all times willing to provide Junior with ample funds to reinstate gas service. Thus, the findings were adequately supported by the evidence without reliance on the ledger.

■ One further issue remains. On a cross-appeal plaintiffs challenge the trial court's interpretation of the word "tenant" as used in section 789.3. The court found that the adult residents of each unit jointly constituted a single "tenant" for the purposes of the section, thus effectively construing the statute as assessing $100 a day for each rental unit. Plaintiffs assert that "tenant" in section 789.3 refers to individuals; that the purpose of the statute is to protect people, not places; and that since a landlord's culpability multiplies as the number of persons affected by his actions increases, the penalty should similarly be enhanced. Under plaintiffs' interpretation there are 16 "tenants"; thus the statutory penalty would be $96,000, rather than the $36,000 assessed by the trial court.

It is a well-settled maxim of statutory construction that "a statute is to be construed in such a way as to render it 'reasonable, fair and harmonious with [its] manifest [legislative] purposes . . . .' [citations], and the literal meaning of its words must give way to avoid harsh results and mischievous or absurd consequences." (*County of San Diego* v. _*Muniz* (1978) 22 Cal.3d 29, 36 [148 Cal.Rptr. 584, 583 P.2d 109].) To

---

any point made for the first time at oral argument, and it will be deemed waived. (See, e.g., *In re Marriage of Reyes* (1979) 97 Cal.App.3d 876, 880 [159 Cal.Rptr. 84].) And this is a fortiori true, of course, of a point that the parties do not themselves raise.

automatically multiply such a "mandatory, fixed, substantial and cumulative" sanction (*Hale, supra,* 22 Cal.3d at p. 400) by the number of occupants of a rental unit would often lead to unduly harsh results. For example, in the case at bar one of defendants' units was occupied by a family of six; under plaintiffs' construction of section 789.3, defendants would have been liable to this family for a mandatory penalty of $600 per day, or $4,200 per week. Even where the landlord's conduct is as reprehensible as that of the defendants here, such a large penal sanction would be unreasonably severe. Thus, we agree with the trial court that "tenant" as used in the penalty formula of section 789.3 refers to all the occupants of a rental unit. The interests of multiple occupants of a single unit are adequately protected by their individual right to actual damages under the statute.

Plaintiffs shall recover their costs on appeal.

The judgment is affirmed.

Bird, C. J., Tobriner, J., Richardson, J., Manuel, J., and Newman, J., concurred.