[No. A083523. First Dist., Div. Two. Feb. 1, 2000.]

CITY AND COUNTY OF SAN FRANCISCO, Plaintiff and Respondent, v. REMBERTO SAINEZ et al., Defendants and Appellants.

COUNSEL

Coblentz, Patch, Duffy & Bass, Jonathan R. Bass, Keith Evans-Orville; Law Offices of Brenda Cruz Keith and Brenda Cruz Keith for Defendants and Appellants.

Louise H. Renne, City Attorney, Patrick J. Mahoney, Chief Deputy City Attorney, Kimon Manolius and Karen Cynthia Carrera, Deputy City Attorneys, for Plaintiff and Respondent.

OPINION

**LAMBDEN, J.**—The City and County of San Francisco (City) brought this action against Remberto and Lourdes Sainez, the owners of multi-unit rental property at 387-391 South Van Ness Avenue, for nuisance abatement and other relief, including civil penalties for violations of the San Francisco Housing Code and San Francisco Building Code (hereafter Housing Code

and Building Code).[1] Bifurcated trial before the Honorable Douglas C. Munson produced an injunction and interlocutory judgment of liability, and then, penalties that included $767,000 imposed under former section 204(d)(2) of the Housing Code.

On this appeal following entry of a final judgment, the Sainezes challenge mainly the Housing Code penalty, claiming it was miscalculated and violated the due process and excessive fines protections of the state and federal Constitutions. We will modify the penalties to correct a miscalculation but will reject defendants' constitutional claims.

BACKGROUND

Defendants bought the property, a six-unit complex, in late 1993, and this case arose from an April 1995 code enforcement task force investigation led by the City's department of building inspection (DBI) in conjunction with public health, police and fire departments. Tenants lacked heat, or adequate heat, and had experienced serious deterioration of walls, ceilings, windows and other structures, some deterioration allowing drafts and rain into the building. Defendants owned many other rental properties in San Francisco and had a history of code enforcement problems.

We borrow from Judge Munson's statement of decision, which the parties do not dispute. "On April 26, 1995, [DBI] mailed Defendants a Notice of Violation ('NOV'). The NOV was based on observations made during the April 21, 1995 inspection. The NOV listed twenty Building and Housing Code violations. Attached to the NOV was a Heat/Hot Water Notice due to lack of heat in two of the units. The code violations listed in the NOV included illegal floors of occupancy, work without permits, lack of smoke detectors on all floors and units, lack of fire extinguishers and smoke detectors, damaged walls and ceilings, lack of heat, hazardous electrical wiring throughout the building, and hazardous plumbing throughout the building. The NOV required that permits be obtained within 30 days in order to correct the code violations.

"Permit applications and plans were not submitted during the 30-day time limit. In June 1995, requests for revisions of the plans were made by DBI. Revisions of the plans were not submitted by Defendants. A Notice of Director's Hearing was mailed to Owners on October 6, 1995. The Hearing was scheduled for October 26, 1995. The Director's Hearing Notice was mailed to Defendants by certified mail and posted at the Property at 387

---

[1]Both codes are found in the City and County of San Francisco Municipal Code but have separately numbered sections. (See Housing Code, § 101.)

South Van Ness. The Director's Hearing Notice was mailed to the address listed in the County Assessor's Office as Defendants' current mailing address . . . . Defendants failed to attend the Director's Hearing on October 26, 1995.

"On November 30, 1995, DBI issued an Order of Abatement. [It] required that within 30 days, Defendants obtain a permit to abate the violations listed in the [NOV]. The Order of Abatement gave Defendants notice that they may appeal the Order to the Abatement Appeals Board within 10 days of the posting and service of the Order. The Order of Abatement was posted at the Property at 387 South Van Ness on December 7, 1995, and sent by mail to Defendants' current mailing address . . . on December 4, 1995. Defendants did not comply with the Order of Abatement.

"On April 10, 1996, DBI referred Defendants' case to the City Attorney's Office to file a complaint for injunctive relief. The City filed its Complaint for Injunctive Relief and penalties on August 16, 1996.

"On November 26, 1996, DBI Inspector Paul Lansdorf issued a Certificate of Final Completion, stating that all violations in the April 1995 NOV were abated.

"On April 4, 1997, DBI re-inspected the Property. New code violations were found to exist. During the April 4, 1997 inspection and after completing a research of the permits, DBI determined that Defendants had done work on the foundation of the Property without a permit, had not applied for necessary electrical permits, and that the plumbing and electrical violations had not been abated. During the April 4, 1997 inspection DBI inspectors discovered that many of the same code violations listed in the April 1995 NOV had reoccurred. On April 4, 1997, DBI revoked the Certificate of Final Completion and issued a new NOV. The new NOV included many of the same code violations listed in the April 1995 NOV.

"Evidence presented during the second phase of trial included evidence of Defendants' financial condition, including evidence that Defendants owned at least 12 properties valued at approximately $4 million. During this phase of the trial, evidence was presented regarding three injunctions issued by this Court pertaining to three other properties owned by Defendants. The three prior injunctions for the properties at 959 Alabama, 1155 York and 979 Alabama, stated that the properties were public nuisances which substantially endangered the health and safety of the residents. All three Injunctions ordered Defendants to abate violations of the San Francisco Housing and Building Codes. Evidence was presented that Defendants violated the terms

of all three injunctions, and that cases were on the Court's Contempt calendar for 2-3 years. Evidence was also presented regarding other NOVs issued by DBI for other properties owned by Defendants. .

"On August 7, 1997 and August 13, 1997, DBI issued two additional Notices for Electrical and Plumbing Code violations."

That part of the judgment at issue on this appeal is the penalty determination. Based on 767 days of violations and a mandatory minimum of $1,000 per day (former Housing Code, § 204(d)(2)), Judge Munson imposed the minimum, for a penalty of $767,000. Based on 53 code violations constituting unfair business practices (Bus. & Prof. Code, § 17200) and a penalty range of up to $2,500 for each violation (*id.*, § 17206, subd. (a)), he chose $100 per violation, for a total of $53,000, but stayed all but a dollar per violation, for $53. Based on six Building Code violations over a period of 580 days and a range up to $500 (former Building Code, § 103), he assessed $25 per violation per day, for a total of $87,000, but again stayed all but a dollar per day of violation, leaving $3,480.

Defendants moved for a new trial on grounds that included excessive damages. They now appeal following denial of that motion and issuance of a statement of decision. Judge Munson subsequently awarded the City attorney fees and costs, but defendants have not challenged or separately appealed from that order.

DISCUSSION

I. *Calculation Error*

The court's award of $767,000 under the Housing Code was based on 767 days of code violations at $1,000 per day, and the parties agree the number of days was incorrect. The total does correspond to the City's request for 187 days under the April 1994 NOV and 580 days under the April 1995 NOV. However, the latter figure mistakenly included the 30-day grace period for compliance specified in the NOV of April 26, 1995 (former Housing Code, § 204(d)(1)); the correct period should be from *May* 26 of that year until November 26 of 1996, the date of the certificate of completion, a period of *550* days, not 580 days. The other figure also appears to include the 30-day grace period of compliance under the second NOV of April 4, 1997, but an adjusted figure of 157 (rather than 187) days is still too high. The correct number—for the period May 4 until August 25, 1997, the first day of trial—should be *113* days. Whatever the source of the error, the parties agree that the total number of violation days should be 550 plus 113, or 663 days,

rather than the 767 days calculated by the court. At $1,000 per day, this of course amounts to an excess penalty of $104,000.

The City is curiously ambivalent about what to do. First pointing to lack of any mention of this error during trial or in the new trial motion and hearing, the City argues that the error is waived. On the other hand, it states: "The City, however, believes that the trial court intended to award penalties beginning on the day that the time allowed for abatement in the NOV's expired. That too was the City's intention." "Thus," we are urged, "this Court can correct the judgment," and we are cited authority for our power to correct such clerical error (*Hennefer v. Butcher* (1986) 182 Cal.App.3d 492, 506-507 [227 Cal.Rptr. 318]). But then, apparently reclaiming its waiver argument, the City says we "should *affirm the judgment in its entirety, or* as corrected to reflect 663 violation days" (italics added). We construe this as a grudging consent to modification and will oblige. As the City observes, this downward adjustment also takes some steam out of defendants' claims of constitutional error in the Housing Code penalty.

But this does not quite settle the matter, for defendants also observe, albeit in a footnote, that the mistaken figure of 580 days (concerning the first NOV) also "infects" the Building Code penalty. They appear to be correct. The court arrived at its unstayed figure of $3,480 by assigning $1 for each of six Building Code violations, multiplied by 580 days. The same minimum penalty for the correct figure of 530 days would yield an unstayed penalty of $3,300. Given the modest amount and the City's lack of response to this point, we find it appropriate to modify the judgment in this respect as well.

## II. *Due Process*

Former Housing Code section 204(d)(2) provided, when this case arose: "Any person or entity violating this Code shall be liable for a civil penalty of not less than $1,000 for each day such violation is committed or permitted to continue, which penalty shall be assessed and recovered in a civil action brought in the name of the people of the City and County of San Francisco by the City Attorney in any court of competent jurisdiction. There shall be no more than one violation per building per day. Any penalty assessed and recovered in an action brought pursuant to this paragraph shall be paid to the Treasurer of the City and County of San Francisco." As amended since the judgment we review, the provision now appears as section 204(c)(2). The only change is that the last sentence now specifies that any penalties paid to the treasurer are "credited to the Department of Building Inspection's Special Fund." The fund itself is not new. The old version stated that "[u]p to 25 percent of the monies collected pursuant to this Section" were "deposited

directly to the Bureau of Building Inspection Special Fund to partially offset the costs incurred by the Bureau of Building Inspection in issuing citations pursuant to this Section." (Former Building Code, § 204(g).)

 Defendants base their due process challenge on *Hale v. Morgan* (1978) 22 Cal.3d 388 [149 Cal.Rptr. 375, 584 P.2d 512] (*Hale*), where our Supreme Court held a utilities disruption penalty in former Civil Code section 789.3 (section 789.3) unconstitutional as applied to impose a $17,300 penalty on a trailer park owner who had tried to evict a tenant by cutting off his water and electrical service. The City relies in turn on *Kinney v. Vaccari* (1980) 27 Cal.3d 348 [165 Cal.Rptr. 787, 612 P.2d 877] (*Kinney*), where the court revisited the same statute and, on different facts, upheld as constitutional a penalty exceeding twice that amount. The statute in both cases punished a landlord's willful act of trying to terminate a tenancy by interrupting utility service and, like the Housing Code provision here, fixed a threshold amount ($100) for each day of violation or continued disruption, without any outside limit or discretion to tailor the penalty to the wrongdoing. Unlike the provision here, the statute placed the right to sue with the tenant, not the government entity, and provided that the tenant would recover actual damages *plus* all of the $100-a-day penalties. (*Hale, supra,* 22 Cal.3d at p. 393.)

The court in *Hale* and *Kinney* addressed the due process guarantee of the state and federal Constitutions that exercises of police power be "procedurally fair and reasonably related to a proper legislative goal . . . ." (*Hale, supra,* 22 Cal.3d at p. 398.) It honored the state's police power to impose penalties to ensure prompt obedience to its regulatory requirements and noted that "[i]mposition of civil penalties has, increasingly in modern times, become a means by which legislatures implement statutory policy." (*Ibid.*)

But the penalty under former section 789.3 was held potentially unconstitutional "in certain situations" because it was mandatory in amount and potentially unlimited in duration (*Kinney, supra,* 27 Cal.3d at p. 352), "[t]he exercise of a reasoned discretion [having been] replaced by an adding machine" (*Hale, supra,* 22 Cal.3d at p. 402). The law required a uniform penalty "even though the statute applied to a broad spectrum of culpable conduct with an equally divergent range of resulting injury" (*Kinney, supra,* 27 Cal.3d at p. 352). Landlords and tenants might "vary significantly in sophistication and financial strength," and the law's structure of rewarding tenants with the penalties could allow a shrewd tenant, "through inaction, [to] convert 'the single wrongful act of [the landlord] into a veritable financial bonanza.' " (*Id.* at pp. 352-353, quoting *Hale, supra,* 22 Cal.3d at p. 403, first bracket added.) The penalty was also "potentially more severe than

that provided by the Legislature for other more serious transgressions by the landlord against the tenant," and thus a penalty could lack conformity with "the Legislature's own perception of the nature of the underlying offenses and of the remedies and appropriate sanctions necessary to achieve and preserve equitable landlord-tenant relations." (*Hale, supra*, 22 Cal.3d at p. 400.) Thus not all applications of the statute would be constitutional. It was necessary to "evaluate the propriety of the sanction on a case-by-case basis," mindful that it would be "upheld unless its unconstitutionality 'clearly, positively and unmistakably appears.' [Citations.]" (*Id.* at p. 404.)

The $17,300 penalty in *Hale* was held unconstitutional. The defendant was a "relatively unsophisticated landlord"—a Daly City cable television installer who had just recently bought a small South Lake Tahoe trailer park containing four or five mobilehomes. (*Hale, supra*, 22 Cal.3d at p. 405.) He had been spurred to disconnect one tenant's utilities when that person, a trespasser who had moved a trailer into the park without permission, agreed when confronted to pay $65 monthly rent, but then did not. (*Id.* at p. 393.) The landlord's conduct, "while doubtless provoked," justified sanctions, but "the *amount* of the penalties" was constitutionally excessive in the circumstances. (*Id.* at p. 405.) The monthly rental had been $65, or $780 for a year, and the penalty had been $17,300. The record did not disclose the purchase price of the park, but it was "not inconceivable" that the tenant, despite having trespassed and then breached his contract, could "end up owning the park or a substantial equity therein . . . ." (*Ibid.*) Such a "confiscatory result [was] wholly disproportionate to any discernible and legitimate legislative goal" and was "so clearly unfair" as to require reversal. (*Ibid.*)

In contrast, a penalty of $36,000 (over twice the *Hale* amount), was upheld in *Kinney*, the court saying that if the statutory penalty had not been justified under those circumstances, it was "difficult to conceive of a case in which it would be applicable." (*Kinney, supra*, 27 Cal.3d at p. 353.) Father and son landlords had cut gas and electrical power to 16 tenants—many long-term tenants and only two of whom were behind in rent. They did so during winter, announcing their intent to oust the tenants and then refusing to accept rent. (*Id.* at pp. 351, 354.) The high court stressed three distinctions from *Hale.* First, there had been little or no provocation by these tenants and no inability by the landlords to pay for the utilities. (*Id.* at pp. 353-354.) Second, unlike the tenant in *Hale* who had done nothing but file suit, these tenants had repeatedly tendered rent before the utilities were cut off, only to be rebuffed, had managed to have electrical service restored and only filed suit after they had tried through the gas company, without success, to have service restored. They had also promptly obtained a temporary restraining order and preliminary injunction, both of which the landlords ignored. (*Id.* at

pp. 354-355.) Third was "the egregious nature" of the landlords' conduct: they had caused gas service disruption for 60 days of "extremely harsh winter weather," which had caused several children and a newborn baby illness from the severe cold. Still "other evidence" justifying the penalties was that the younger landlord had often been intoxicated and cursed and threatened the tenants "at all hours of the day and night." (*Id.* at pp. 355-356.) Finally, the amount could not be called confiscatory as exceeding the value of the premises. The landlords had failed to produce any evidence of the value, and monthly rental receipts had been shown to exceed $1,000. (*Id.* at p. 356, fn. 6.) The only hint of what the court might have found excessive came on a different issue. The $36,000 penalty had been computed by multiplying the $100 penalty by 60 days and then by six, the number of rental units. In declining to construe the word "tenant" in the statute as including not the number of units but the total number of occupants, the court stated, "Even where the landlord's conduct is as reprehensible as that of the defendants here, such a large penal sanction would be unreasonably severe." (*Id.* at p. 358.)

Defendants spend much energy arguing that the penalty provision here suffers from the same vices as the one in *Hale* and *Kinney*—lack of discretion, a mandatory base amount and a potentially unlimited duration—to which they add that this provision, at $1,000 a day, is "much more draconian" and closer to the severe result the Supreme Court in *Hale* decried in rejecting a per occupant construction of the statute. We observe initially, however, that the difference in penalty is not what defendants make it out to be. They omit to mention that the $36,000 penalty upheld in *Kinney* consisted of $600 a day—the $100 minimum times six rental units. This is not far removed from the $1,000-a-day penalty here (also applied to a six-unit property). It is even less far removed when we consider the effect of inflation over the 20 years since the events at issue in *Kinney*.

Also, the lack of discretion and potentially unlimited amount of penalty here do not mean, as defendants have broadly stated in their briefing, that the penalty "provision" or "scheme" is unconstitutional; rather, as *Hale* and *Kinney* make clear, it only means that a penalty imposed under the provision is to be examined for constitutionality *as applied.* Judge Munson knew this from the arguments raised below and presumably considered all of the circumstances placed before him. Defendants complain that he foreclosed their presentation of "good faith" evidence, but this is misleading. He made statements to that effect only regarding the violation phase of trial. For example, he said: "Counsel, I think at this stage a good faith or intercriminal [*sic*] intent, none of that is really relevant, because I am not going to address

the fines and the penalties at this phase. I am only interested in liability, as far as whether or not the property either conformed or didn't conform to the building codes, as far as the injunctive relief is concerned. So while this is all interesting in mitigation, it might be more appropriate to produce this at a later part of the trial." Defendants cite no instance in the record where the judge cut short or prevented evidence of their good faith during the *penalty phase* of the bifurcated trial. Any lack of such evidence in the record is accordingly defendants' own doing.

■ The parties agree that our review of the ruling on the constitutional question is independent judgment, or de novo (*Townsel v. San Diego Metropolitan Transit Development Bd.* (1998) 65 Cal.App.4th 940, 946 [77 Cal.Rptr.2d 231]), but with deference to underlying factual findings, which we review for substantial evidence, viewing the record in the light most favorable to the ruling (*Ojavan Investors, Inc. v. California Coastal Com.* (1997) 54 Cal.App.4th 373, 395 [62 Cal.Rptr.2d 803] (*Ojavan*); cf. *People v. Dillon* (1983) 34 Cal.3d 441, 455-456, 477-478 [194 Cal.Rptr. 390, 668 P.2d 697] [cruel or unusual punishment]). ■ Defendants insist there are *no* such findings, noting that Judge Munson said repeatedly—orally and in his statement of decision—that he felt he had *no discretion* to stay or reduce the minimum $1,000 penalty under the Housing Code (and would have done so had discretion existed). However, this confuses discretion with the constitutional question. The judge correctly concluded that the Housing Code gave him no discretion to impose less than $1,000 per day of violation. But he also stressed that he had the power and duty to decide whether the penalty violated due process as applied and that such factors as defendants' culpability and financial situation were relevant to his task. For example, he asked counsel for argument on "culpability, moral culpability," and said case law required him to consider "the nature, the seriousness, the number of violations, persistence of the misconduct, . . . willfulness. Those are the issues I am interested in hearing you argue." (See Bus. & Prof. Code, § 17206, subd. (b).) Because defendants do not show that express findings on such factors were legally required or requested for inclusion in the statement of decision, we are free to follow our usual appellate course and *imply* such findings to support the ruling. (Cf. *Ojavan, supra,* 54 Cal.App.4th at p. 395 [parties stipulated that statement of decision include five factors influencing court's exercise of discretion].)

Also, we bear in mind that while Judge Munson was careful to say he had no discretion and was exercising none for the Housing Code penalty, he did effectively achieve some balance by staying all but $1 of each penalty imposed under the Building Code and the state Business and Professions Code. This is clear from such comments as: "Let's talk about all of the codes

lumped up in one sum. When I say penalty, I mean B & P, Housing and everything in one lump sum. . . . [¶] So let's take everything you want, every dime that you want in penalties, from whatever source, B & P, Building, Housing Codes, everything, one lump sum, what is that figure that you think is appropriate? And then we will work from there. . . ." The judge similarly said after hearing all argument: "I am going to take this matter under submission and in a cool, calm manner, several days or weeks down the line dispassionately, review your arguments and make some calculations and *I will come up with a figure that I think is appropriate, given the total record in the case and the California case law and the statutes that have been given to me to apply to the case.*" (Italics added.) Thus the judge did use various factors to mitigate total penalties.

Moving then to factors identified in *Hale* and *Kinney*, we begin with provocation and note that there was none, either by the tenants or by the City, the plaintiff in this suit. Evidence shows that the City exercised restraint and worked at length with defendants toward a resolution that would avoid litigation. Deadlines were extended, and warnings were given. The matter was not referred to the city attorney until a year after the first NOV, and suit was not filed until August 1996, nearly 16 months after the NOV. The court could reasonably find, and implicitly did find, remarkable restraint by the City given its past experience with defendants' pattern of delay, violation of court orders and last-minute compliance for similar violations involving other properties.

Defendants depict themselves as victims of a system in which one can become trapped by whimsical or capricious inaction by the City between the time that an NOV issues and a certificate of completion issues—the period during which the clock runs on mounting, confiscatory penalties of $1,000 a day. They even urge that this poses a hopeless conflict of interest for the City, which both controls the extent of penalties and gains from them. We find this interesting in theory and showing some *potential* for abuse. However, in the end defendants point to no instances *on this record* where any good faith efforts at remediation or compliance were impeded by unreasonable inaction or demands by the City. The contrary in fact appears. The City, for example, issued a notice of final completion only to discover that this was premature and required issuance of a second NOV. The removal of construction materials from the basement—an attempted illegal conversion to living units—had revealed foundation work done without permit (and other things) unobserved before. And after the matter had been referred to the city attorney, the City worked with defendants' engineer, Abraham Zavala, until he quit the project at the end of July 1996. Zavala testified that defendants stopped the work, tried to evict the tenants (without need in his

opinion) and were not paying him for his time. The City had also worked with defendants' prior engineer, Javier Chavarria, who quit as well, exasperated by lack of cooperation and direction from defendants.

The Housing Code penalty, of course, is paid to the City's treasury and in part funds code enforcement efforts (former Housing Code, § 204(d)(2)), and this marks a significant difference from the penalty scheme in *Hale* and *Kinney*, which gave tenants a windfall beyond their actual damages and costs. Here, two elderly tenant couples who paid low monthly rents (around $304) reacted to defendants' efforts to evict them by ultimately bringing a separate action against defendants for damages and the right to stay. But the City was not involved in that suit, and not a penny of the $1,000 a day penalties in this suit will go to tenants. Thus there is no concern here, as there was in *Hale*, of penalties creating a "veritable financial bonanza" that ill serves public policy. (*Hale, supra,* 22 Cal.3d at p. 403.) Both parties acknowledge the City's legitimate police power goals of ensuring the health and safety of its residents and preserving its housing stock. (Former Housing Code, §§ 100 [policy to "protect and promote the existence of sound and wholesome residential buildings"], 102 [purpose "to provide for the maintenance of the minimum requirements for the protection of life, limb, health, property, safety and welfare of the general public and the owners and occupants of residential buildings"].)

Served also is the legitimate police power device of "securing obedience" to the code requirements through penalties. (*Hale, supra,* 22 Cal.3d at p. 398.) ■ This requires more than compensation of tenant losses, a penalty that might achieve little or no compliance. (*People ex rel. State Air Resources Bd. v. Wilmshurst* (1999) 68 Cal.App.4th 1332, 1351 [81 Cal.Rptr.2d 221].) "[C]ivil penalties may have a punitive or deterrent aspect, [but] their primary purpose is to secure obedience to statutes and regulations imposed to assure important public policy objectives." (*Kizer v. County of San Mateo* (1991) 53 Cal.3d 139, 147-148 [279 Cal.Rptr. 318, 806 P.2d 1353].) ■ Civil penalties under former Housing Code section 204(d) require no proof of actual harm to a tenant, and this is not uncommon for a civil penalty (*Kizer v. County of San Mateo, supra,* 53 Cal.3d at p. 147). ■ Moreover, "[a] penalty statute pre-supposes that its violation produces damage beyond that which is compensable." (*State of California v. City and County of San Francisco* (1979) 94 Cal.App.3d 522, 531 [156 Cal.Rptr. 542].)

■ We have already noted that the penalty of $1,000 a day is comparable to the $600 a day upheld as reasonable in *Kinney*, two decades ago, for property involving the same number of units. The cumulative size of this

penalty, of course, is far greater because it mounted over the course of some two years, whereas the penalty in *Kinney* accumulated for only two months. (*Kinney, supra*, 27 Cal.3d at p. 351.) However, defendants cannot complain when they had control over this time period yet allowed the penalties to accumulate. One case has noted, in upholding an award of $100 a day under former section 789.3 for each of 73 violations: "While the fines total over $9.5 million, the amount is large only because [the defendants] violated the Coastal Act 73 times *and refused to remedy the violations.*" (*Ojavan, supra*, 54 Cal.App.4th at p. 398, italics added.) The amount was found "proportional to the number of violations" and the "flagrant disregard" of the violations. (*Ibid.*) Here likewise, and despite warning and extensions of the correction or abatement periods, defendants delayed, failed to respond and had made only partial progress even by the time of trial. Judge Munson impliedly found that defendants had their own intransigence to blame for the $663,000 in accumulated penalties. Defendants had it within their control first to prevent and then to stop the accumulation of penalties. (Contrast *People ex rel. Younger v. Superior Court* (1976) 16 Cal.3d 30, 43-44 [127 Cal.Rptr. 122, 544 P.2d 1322] [penalty for each day spilled oil remained on the water would stress not culpability but a factor normally beyond the control of the violator].)

Judge Munson realized that an accumulated penalty might, despite such fault, be too severe in light of a defendant's overall culpability and financial circumstances, but he found the total here not impermissibly disproportionate "to the conduct" or to defendants' "net worth." We have already noted some of the evidence of culpability. Judge Munson could reasonably conclude that defendants allowed serious violations to persist and worsen and then used those very conditions as an excuse to try to evict elderly, long-term, low-rent tenants like those who testified at trial. He could also find and consider not just the violations resulting from neglect, but those flowing from deliberate and knowingly illegal attempts to convert the basement area into more living units. He could find, given defendants' pattern of having done this in other properties, that this was a flagrant evasion of municipal law. Lack of heat, inadequate heat, open walls, leaking ceilings and exposed electrical work were also violations of health and safety standards that seriously jeopardized tenants' well-being. Sixty-five-year-old Gloria Gallardo testified, for example, that she and her retired husband, 21-year residents of the building, had suffered continuous bouts of illness from the cold in their unheated apartment, a condition that, despite repeat complaints to defendants, remained unrectified until the summer of 1996. Substantial evidence supports implied findings of egregious misconduct and serious violations.

That brings us to defendants' financial circumstances. Defendants point to Judge Munson's focus on their net worth, and the prospect of bankrupting

them, as meaning he mistakenly saw the due process inquiry as limited to a net worth proportionality test. We disagree. The judge weighed many factors; his stress on the factor of net worth appears attributable to the stress placed on it by counsel and to the reality that all other factors in this case weighed so clearly in favor of a large penalty.

On the factor of financial circumstances, *Hale* faulted the discretionless penalty of former section 789.3 in part because: "A large corporate landlord which callously and by design pursues a policy of 'shock' eviction suffers no greater penalty than the elderly widow of modest means who, dependent on the income from a single unit, ignorant of the penalty provisions of the law, exhausted by the machinations of a wily and recalcitrant tenant, and no longer willing or able to bear the expense of utilities for an occupant who refuses to pay rent, finally terminates the tenant's utility services in order to speed his departure." (*Hale, supra,* 22 Cal.3d at pp. 399-400.) No such horror story appears here. Defendants stressed in testimony that they were Spanish-speaking immigrants without schooling beyond a sixth grade education in Mexico, but the court could reasonably find them far more sophisticated than this might suggest. Riding a rising housing market, defendants had parlayed a single investment into 14 rental properties over a period of 15 years. They took interest-only loans and used the equity of appreciation to leverage more purchases. In the year before trial, their total rental income exceeded $276,000, and their real estate holdings were worth about $4.35 million. Debt of $2,015,317 left them a total equity of $2,334,683. The evidence also reasonably showed a pattern of buying property, doing little or no maintenance unless compelled to do so, and adding illegal units. They used no management firm and claimed to manage the business themselves. They claimed to lack ledgers showing income or expenditures, to deal in cash without giving receipts, and to report *orally* to their tax preparer each year. Four of their properties were on the market at the time of trial, potentially bringing profits totaling $876,000. They had much experience with City code requirements, and the consequences of noncompliance, from their many dealings with the City over the years. Judge Munson could reasonably find solid sophistication and construe their lack of formality as a sign of calculated canniness, not naiveté.

The penalty of $663,000 represents about 28.4 percent of the net worth figure of $2,334,683 and 240 percent of the total rental income figure of $276,220. However, we believe the rental comparison should rest on *two* years of rent given that the 663 days of violations represented nearly two years; this yields a comparison closer to 120 percent. Defendants insist that our inquiry must be limited to their equity in or income from the offending property alone, for that is what the Supreme Court discussed in *Kinney* and

*Hale.* We disagree. The court in *Hale*, while conceding it had no evidence on the point, did speculate that the $17,300 penalty might result in the plaintiff tenant obtaining a full or substantial ownership interest in the trailer park, a result "wholly disproportionate to any discernible and legitimate legislative goal . . . ." (*Hale, supra,* 22 Cal.3d at p. 405.) It appears, however, that there was likewise no evidence of total net worth and that the court simply had no occasion to consider the question. ■ An opinion is not authority for a proposition not considered. (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 [39 Cal.Rptr. 377, 393 P.2d 689].) ■ We must also recall that the statutory scheme of former section 789.3 awarded the penalty to the tenant *in addition to* compensatory damages and costs, an abuse-prone feature that made it easy for the court to find the *Hale* penalty in excess of "any discernible and legitimate legislative goal" (*Hale, supra,* 22 Cal.3d at p. 405). Unlike the case before us, there was no legislative goal in former section 789.3 to compensate a governmental entity for any costs of enforcement. Similarly, the court in *Kinney* had no evidence of value, except for monthly rents on the property in question, and it was the *defendants*, not the Supreme Court, who framed the issue as whether the judgment was "confiscatory in that it exceeds the value of the premises . . . ." (*Kinney, supra,* 27 Cal.3d at p. 356, fn. 6.) The court simply declined to decide, noting first the defendants' failure to adduce evidence of value, and second, the existence of monthly rental value evidence of $1,000 in any event. (*Ibid.*)

While neither *Hale* nor *Kinney* expressly considered or had evidence of total net worth, both decisions suggest that net worth can bear on the due process question. *Hale* decried a lack of discretion in former section 789.3 as meaning that "fixed penalties are imposed upon potential defendants who may vary greatly in sophistication and financial strength" (*Hale, supra,* 22 Cal.3d at p. 399), and *Kinney* found the penalty before it *not* excessive because the punitive assessments were " 'both proportioned to the landlord's misconduct and necessary to achieve the penalty's deterrent purposes' " (*Kinney, supra,* 27 Cal.3d at p. 356, quoting *Hale, supra,* 22 Cal.3d at p. 404). "Financial strength" is a term implying more than one particular asset, and achieving "deterrent purposes" also supposes that the penalty is large enough to hurt overall, not just diminish the value of a single asset. This also accords with notions of due process in the analogous context of assessing the excessiveness of a punitive damages award (Civ. Code, § 3294), which since the decision in *Adams v. Murakami* (1991) 54 Cal.3d 105 [284 Cal.Rptr. 318, 813 P.2d 1348] (*Adams*), has required an assessment with knowledge of full net worth. ■ The purpose of punitive damages is "a purely *public* one" (*id.* at p. 110)—like that of the Housing Code in assuring safety and preserving housing—and likewise functions to deter. "Because the quintessence of punitive damages is to deter future misconduct by the defendant,

the key question before the reviewing court is whether the amount of damages 'exceeds the level necessary to properly punish and deter.' [Citations.] The question cannot be answered in the abstract. The reviewing court must consider the amount of the award *in light of* the relevant facts. The nature of the inquiry is comparative. Deciding in the abstract whether an award is 'excessive' is like deciding whether it is 'bigger,' without asking 'Bigger than what?' " (*Ibid.*) While our Supreme Court has defined that inquiry as arising under state law, it has noted that federal high court precedent holds that some such judicial scrutiny is required by substantive due process under the federal Constitution. (*Id.* at pp. 116-118, discussing *Pacific Mutual Life Insurance Co. v. Haslip* (1991) 499 U.S. 1 [111 S.Ct. 1032, 113 L.Ed.2d 1] (*Haslip*).) The court has declined to decide "whether the traditional California 'passion and prejudice' standard of review is constitutionally sufficient under *Haslip*" (*Adams, supra,* at p. 119, fn. 9), but other courts have concluded that it is (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1256-1259 [1 Cal.Rptr.2d 301]; *Boyle v. Lorimar Productions, Inc.* (9th Cir. 1994) 13 F.3d 1357, 1359-1360).

Accordingly, we hold that, as in the case of substantive due process protection against excessive punitive damages awards, substantive due process protection against civil penalties under the rationale of *Hale* and *Kinney* allows inquiry into a defendant's full net worth, not just the value of the particular property at issue in the case. This was the approach taken in a case heavily relied on by defendants, *Balmoral Hotel Tenants Assn. v. Lee* (1990) 226 Cal.App.3d 686 [276 Cal.Rptr. 640] (*Balmoral*). There, in rejecting an argument that a treble damages provision in the San Francisco Administrative Code should include damages for mental anguish, the Court of Appeal reasoned that to so hold could create unconstitutional results. In that case, for example, a total award of $4.8 million would be excessive and exceed 50 percent of the defendant's net worth of over $7 million. (*Id.* at p. 696.) Alternatively, it would also be excessive ("unconscionable") as exceeding the value of the affected property, a hotel worth $2.1 million. ■ In our case, as already stated, the penalty of $663,000 is far less than in *Balmoral*— about 28.4 percent of net worth and 120 percent of total rents due for the two-year period in which the violations existed.

We do not limit ourselves to the equity or rental proceeds from the affected six-unit building. To do so could pose problems seriously at odds with the policy goal of deterrence. First would be the determination of which assets are affected. Here, for example, we had 14 rental properties constituting a financially integrated investment/income enterprise. Limiting the penalty to a certain proportional share of the equity (market value minus the

purchase price or remaining debt) in one property could mask the fact that the equity had served as security or a down payment for other properties. This could artificially insulate a defendant from penalties and remove all effective deterrence. That might be the case here, for example, where the affected property, financed with an interest-only loan, has a value of $300,000 but apparent equity of only $37,374; defendants' equity in the total enterprise, on the other hand, exceeds $2.3 million. A second and related problem would be inviting defendants to use manipulative financing. The affected property could be refinanced to maximize its debt and remove equity for use elsewhere in the enterprise. Then, despite serious and long-standing code violations, the owner would be immunized because even modest accumulations of penalties could leave the property, at least on the books, valueless and "confiscated." Again, no effective deterrence. Third, it could prove difficult to separate the value of, say, a business license from a defendant's other assets. In one such case where a due process argument was raised against cumulative penalties, our Supreme Court phrased the issue as whether the penalties were "excessive in view of a licensee's conduct *and financial status* and would thus result . . . in the surrender of his license." (*Walsh v. Kirby* (1974) 13 Cal.3d 95, 105 [118 Cal.Rptr. 1, 529 P.2d 33], italics added.) This further confirms our view that consideration of a defendant's *overall* financial status is proper. (See also *People ex rel. Van de Kamp v. Cappuccio, Inc.* (1988) 204 Cal.App.3d 750, 765 [251 Cal.Rptr. 657] [in due process review of penalty for fishing violations, court could consider defendant's "financial condition," including salary and gross income for the year].)

Next, we examine whether a penalty seems so far out of proportion to other such penalties that we can say the provision lacked conformity with the drafting body's own perceptions of the nature of the problem and the appropriate sanctions for achieving the desired policy goals. (*Hale, supra,* 22 Cal.3d at p. 400.) We are not concerned here with landlord/tenant relations as such, for the Building Code provision is limited to correcting or preventing health and safety violations.

The penalty here is the minimum figure of $1,000 per day of violation (former Housing Code, § 204(d)(2)), and comparable penalties existed in other provisions of the Housing and Building Codes. Former Housing Code section 204(a)(1) authorized misdemeanor prosecution for each day of violation involving conditions endangering life or safety and set the per day penalty at $500 to $1,000 (minimum and maximum), jail not exceeding six months, *or both.* (Former Housing Code, § 204(a)(2).) Less serious violations were punishable as infractions, in which case the fine escalated from $100 to $200 to $500 for each succeeding violation within a one-year period,

with a cap of $7,500 per building (former Housing Code, § 204(c)(1)), a cap that did not apply to misdemeanors (and has since been repealed in any event). Many of the violations in this case involved threats to safety. The Building Code was potentially more severe. For residential units like those involved here, it set per day penalties of up to $500 *for each violation.* (Former Building Code, § 103.) The penalty provision used in this case, while setting a minimum fine of $1,000, limited violations to "one . . . per building per day" (former Housing Code, § 204(d)(2)). Also comparably harsh is Business and Professions Code section 17206, under which each of the 53 violations was charged and found by Judge Munson to be an unfair business practice. While the judge imposed an unstayed penalty of only $1 per violation, the provision allowed him to impose up to $2,500 "for each violation." (Bus. & Prof. Code, § 17206, subd. (a).) We find no serious disparity between former Housing Code section 204(d)(2) and these other provisions, especially since Judge Munson chose the $1,000 minimum.

On the full record, we cannot conclude that the unconstitutionality of the penalty as applied here clearly, positively and unmistakably appears. (*Hale, supra,* 22 Cal.3d at p. 404.) Judge Munson found the penalty severe and indicated he would have reduced it had he any discretion to do so. However, he also found no due process violation, and this means he implicitly recognized that the boundaries of due process lay somewhere beyond where his preferences lay. His ruling was not in error; the due process claim fails.

### III. *Excessive Fine*

■ Defendants contend that the Housing Code penalty violated the excessive fines clauses of the federal and state Constitutions. (U.S. Const., 8th Amend; Cal. Const., art. I, § 17.) They rely mainly on cases construing the federal clause, conceding that the state provision "imposes an essentially identical restriction . . . ."

■ The law is settled that a civil penalty such as the one here, by virtue of its partially punitive purpose, is a *fine* for purposes of the constitutional protection. (*United States v. Bajakajian* (1998) 524 U.S. 321, 334 [118 S.Ct. 2028, 2036, 141 L.Ed.2d 314] (*Bajakajian*); *Austin v. United States* (1993) 509 U.S. 602, 609-610 [113 S.Ct. 2801, 2805-2806, 125 L.Ed.2d 488].) The question is whether it is *excessive.* So far the federal high court has spoken only in the context of forfeiture laws—where property is forfeited for involvement in criminal offenses. (See generally *Bajakajian, supra,* at p. 334; *Austin, supra,* at pp. 609-610.) This is not a perfect fit for our situation, but we draw upon it for guidance.

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must

bear some relationship to the gravity of the offense that it is designed to punish. [Citations.] . . . [A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." (*Bajakajian, supra,* 524 U.S. at p. 334 [118 S.Ct. at p. 2036].) *Bajakajian* adopted a *gross disproportionality* standard articulated in cruel and unusual punishments clause precedent to hold that a reviewing court "must compare the amount of the forfeiture to the gravity of the defendant's offense. If the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional." (*Id.* at pp. 336-337 [118 S.Ct. at pp. 2037-2038].) The court assessed disproportionality by examining the nature of the crime (willful failure to report the removal of currency from the country) and its criminal punishment, the harm the defendant had caused, and other penalties for like offenses. (*Id.* at pp. 337-339 [118 S.Ct. at pp. 2038-2039].) The forfeiture in that case—the entire $357,144 the defendant had been carrying through an airport—was held grossly disproportionate. Parenthetically, the court noted that the defendant had not urged that "his wealth or income [were] relevant to the proportionality determination or that full forfeiture would deprive him of his livelihood." (*Id.* at p. 340, fn. 15 [118 S.Ct. at p. 2039].) Other authority has since held, and we agree, that "in the case of fines, as opposed to forfeitures, the defendant's ability to pay is a factor under the Excessive Fines Clause. [Citations.]" (*U.S. v. Lippert* (8th Cir. 1998) 148 F.3d 974, 978.) " 'Proportionality is likely to be the most important issue in a forfeiture case, since the claimant-defendant is able to pay by forfeiting the disputed asset. In imposing a fine, on the other hand, ability to pay becomes a critical factor.' . . . ." (*People ex rel. State Air Resources Bd. v. Wilmshurst, supra,* 68 Cal.App.4th at p. 1350, quoting *U.S. v. Hines* (8th Cir. 1996) 88 F.3d 661, 664.)

 In key respects, this proportionality review duplicates the due process analysis already set out in part II, above. We therefore incorporate our comparison of the penalty with other penalties and our discussion of defendants' net worth of $2.3 million, both of which factors support the constitutionality of the $663,000 penalty. A net worth of about $500,000 has been held enough ability to pay to uphold a penalty of $353,000 (*U.S. v. Lippert, supra,* 148 F.3d at pp. 976, 978), and the ratio here is not nearly so great, particularly if we include in defendants' ability to pay their $276,000 of yearly rental income.

That leaves the factors of the nature of the crime, its criminal punishment, and the harm defendants caused. The "crime" here amounts to numerous instances of ignoring or disobeying orders to abate or rectify substandard housing conditions affecting the public health and safety, a highly serious matter, and possible criminal punishment, as already noted, included misdemeanor convictions—with jail terms up to six months and fines between

$500 and $1,000—for each violation (former Housing Code, § 204(a)(2)), a penalty of potentially severe cumulative effect. These factors support the high penalty of $663,000.

So does the last factor, the harm done by defendants' "crime" of failure to correct the violations. These violations included a complete lack of heat to elderly, fixed income tenants, insufficient heat to others, broken and leaking walls and ceilings, exposed wiring, lack of adequate fire protection, and illegal construction that blocked fire and emergency egress. Some of violations went uncured for years, and tenants suffered illness and cold. Defendants did "harm" of another sort by flouting the City's efforts to secure corrections. Contrary to defendants' view, Judge Munson's reduction of Building Code and unfair business practice penalties was not a finding of insignificant violations; it was rather, as the judge himself explained, an effort to compensate for lack of discretion in the Housing Code and to bring the total penalty down to a less onerous level. Defendants point to the *Bajakajian* examination of whether the crime is "[]related to any other illegal activities." (*Bajakajian, supra,* 524 U.S. at pp. 337-338 [118 S.Ct. at p. 2038].) The concern in *Bajakajian*, however, was that the unreported currency was not tied to any underlying criminal acts against which the reporting requirement was directed. There is no need to draw such a connection here, for the code violations themselves were the evil against which the penalty was addressed.

No violation of the constitutional protections against excessive fines appears.

### DISPOSITION

The judgment is modified to reflect a Housing Code violation for 663 days, with a penalty of $663,000, and Building Code violations for 530 days, with an unstayed penalty of $3,300. As so modified, and in all other respects, the judgment is affirmed.

Kline, P. J., and Ruvolo, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 10, 2000. Kennard, J., was of the opinion that the petition should be granted.