Filed 12/1/21  P. v. Johnson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C088676 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE008771) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING |
| ELIJAH JOHNSON et al., | |
| Defendants and Appellants. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on November 9, 2021, be modified as follows:

On page 36, footnote 3 is deleted.

On page 36, under part III, section B, subsection 2, titled "*Reckless Indifference to Human Life*", the following is added after the last paragraph:

Lastly, before turning to Johnson's final claim, we address an argument that Johnson raised at oral argument and repeated in a petition for rehearing. For the first time at oral argument, Johnson offered a new ground for countering the finding that he acted with reckless indifference to human life: He was only 21 years old at the time of the crime. In support, he largely relied on two sources: (1) section 3051, which, since 2018, has treated offenders 25 years of age or younger as "youth offenders" who are entitled to enhanced parole opportunities in light of their reduced maturity (Stats. 2017, ch. 675, § 1); and (2) a recent court decision that found the age of a defendant, who was only 16 years old at the time of the crime, was relevant in determining whether he acted with reckless indifference to human life (*In re Moore* (2021) 68 Cal.App.5th 434 (*Moore*)).

In our initial opinion, we treated the argument as forfeited because Johnson had offered it for the first time at oral argument without good cause. (*Kinney v. Vaccari* (1980) 27 Cal.3d 348, 356, fn. 6.) In doing so, we acknowledged that the *Moore* decision was a new one. But we found that the principles underlying it were not. (See, e.g., *J.D.B. v. North Carolina* (2011) 564 U.S. 261, 272 [180 L.Ed. 2d 310].) Even the relevant text from section 3051, we emphasized, was enacted years before the briefing in this case.

In his petition for rehearing, however, Johnson contended our reasoning was improper. He principally argued that although the *Moore* court's reasoning relied on older cases, and although the relevant text in section 3051 was enacted years before the briefing in this case, the *Moore* court was nonetheless the first to consider age when evaluating whether a defendant acted with reckless indifference to human life under the "*Banks-Clark* analysis." He then added that to the extent his attorney's failure to timely raise the issue of his age resulted in forfeiture, his attorney provided ineffective assistance of counsel.

2

We find neither argument persuasive. To start, although true that the *Moore* court was the first to consider age in the "*Banks-Clark* analysis," our high court had previously explained that courts should consider "the totality of circumstances" (which, of course, can include age) when evaluating whether a defendant acted with reckless indifference to human life. (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) In this case, Johnson had ample opportunity to discuss the totality of the circumstances in his briefing, and although he may now regret not highlighting certain facts (like his age), we do not find that to be good cause for raising new fact-based claims at oral argument.

In any event, even had Johnson timely raised the same type of argument made in *Moore*, our conclusion in this case would have been no different. The court in *Moore* considered a habeas claim of a defendant who challenged a jury's felony-murder special circumstance finding. (*Moore*, 68 Cal.App.5th at p. 439.) According to the court, because the defendant was not the actual killer in the case, the jury's finding could not stand unless the evidence established that he was both a major participant in the crime and acted with reckless indifference to human life. (*Id.* at p. 45; but see § 190.2, subd. (c).) Focusing on the latter requirement and his young age, 16 years old, at the time of the crime, the defendant argued that the evidence was insufficient to establish that he acted with reckless indifference to human life. (*Moore*, at p. 445; see also *id.* at p. 451.) The court agreed. It first noted that courts have long recognized that children are generally less mature than adults and " 'possess only an incomplete ability to understand the world around them.' [Citation.]" (*Id.* at pp. 453-454.) It then stated that it could not conclude that the defendant, only a child at the time of the crime, "was subjectively aware that his actions created a graver risk of death than any other armed robbery"— which the court found precluded a finding that the defendant acted with reckless indifference to human life when considered together with the totality of the circumstances. (*Id.* at pp. 454-455.)

3

But had Johnson timely raised this same type of argument here, we would not have been moved to reach a different outcome. Johnson, unlike the defendant in *Moore*, was not a child at the time of the crime. He was 21 years old. And although he was perhaps more likely to engage in reckless activity because of his youthful age (see *People v. Franklin* (2016) 63 Cal.4th 261, 274), we cannot say that his age meaningfully undermined his ability to appreciate "that his actions created a graver risk of death than any other armed robbery" (*Moore*, 68 Cal.App.5th at p. 454). Nor, considering the totality of the circumstances, including Johnson's age, can we say that insufficient evidence supported the jury's finding. Ultimately, in our view, Johnson's age at the time of the crime carries more relevance on the topic of punishment (see *Franklin*, 63 Cal.4th at p. 274; § 3051) than on the topic of guilt. But that consideration does not assist Johnson in his argument here.

There is no change in the judgment. The petition for rehearing is denied.

BY THE COURT:

_____\s\_____,
BLEASE, Acting P. J.

We concur:

\_\_\_\_\_\s\_____,
MAURO, J.

\_\_\_\_\_\s\_____,
DUARTE, J.

4

Filed 11/9/21  P. v. Johnson CA3 (unmodified opinion)

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

| |
|---|
| **California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.** |

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C0088676 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE008771) |
| v. | |
| ELIJAH JOHNSON et al., | |
| Defendants and Appellants. | |

Appellants David Nguyen and Elijah Johnson forced their way into a drug dealer's house expecting to find a stockpile of cash.  After failing to find the anticipated cash, Nguyen shot to death three of the home's occupants.  A jury afterward, among other things, convicted Nguyen and Johnson of three first degree murders and found true the "special circumstances" allegations that the murders were committed during a robbery. The trial court sentenced both to life in prison without the possibility of parole.

On appeal, Nguyen and Johnson together raise four issues.  First, both assert that the trial court wrongly admitted into evidence the unredacted plea agreements of

1

appellants' getaway driver and one other accomplice.  The plea agreements, as relevant here, noted that a judge would determine whether these two witnesses had testified truthfully at appellants' trial.  According to appellants, in allowing the jury to see this language, the trial court improperly "invite[d] the jury to assume that if perjury is discovered after the fact, any verdict that is reached can be corrected."  Second, appellants contend the court wrongly removed a juror, who other jurors had accused of failing to follow the law, without conducting an adequate inquiry.  Third, Johnson contends insufficient evidence supports his murder convictions and the associated special circumstances findings.  And fourth, Johnson contends reversal is warranted because of the cumulatively prejudicial effect of the admission of the unredacted plea agreements and the removal of the juror.

We reject appellants' contentions.  We find the trial court's admission of the unredacted plea agreements, even if improper, was not prejudicial.  We find the trial court had sufficient grounds to remove the juror.  We find sufficient evidence supports the jury's verdict against Johnson.  And we find no cumulative prejudicial error.  We do, however, find one error that requires correction:  As the Attorney General notes, the abstract of judgment for Nguyen does not reflect the sentence that the trial court orally imposed.  We will direct the trial court to correct the abstract of judgment to address the issue.

BACKGROUND

I

*Factual Background*

A little before 3:00 a.m. on April 26, 2016, Nguyen texted a friend, Amanda Tucker, about a potential "lick"—a term that Tucker described as slang for a robbery.  He texted, "Tonight I'm hitting this one lick for $30,000."  Tucker responded, "You want [Johnson]"—her then-boyfriend—"to come?"  Nguyen said he did, adding that he had a gun for Johnson and Johnson would be entitled to a third of the money.

2

Johnson met Nguyen a week before through Tucker and owed Nguyen $425 for marijuana he had given them at the time. After Tucker shared the gist of Nguyen's plan (though omitting the part about the gun), Johnson initially expressed a lack of interest. But after speaking with Nguyen over the phone, Johnson agreed to join. According to Johnson, Nguyen said he could "get 10,000" out of a "$30,000 robbery" and have his "debt . . . repaid." Under the plan, Tucker, Johnson, and Tayler C.—a minor who Tucker was mentoring in prostitution—would pick up Nguyen in Tucker's car and they would then "hit the lick."

Tucker, Johnson, and Tayler C. afterward picked up Nguyen as planned. Both Johnson and Tayler C. thought Nguyen appeared to be high on some drug—perhaps cocaine, Johnson thought. As Nguyen directed Tucker where to drive, Nguyen took a Xanax and pulled out black latex gloves, which he and Johnson put on. Nguyen then pulled out two semiautomatic handguns.

After driving for about 40 minutes, Nguyen pointed out the target—the home of Nguyen's friend and marijuana supplier, Dong L.[1] One of Dong's brothers, Rembo L., and his mother, Be V., lived there too. Nguyen afterward explained a motive for targeting Dong—Dong and another man had recently drugged and raped a young woman he knew. Johnson, in response, said that if something similar had happened to Tucker, it would be "the end of the story," or something to that effect. Although never mentioned at the time, Tucker later learned that lying behind Nguyen's expressed motive was potentially another—Dong had an ongoing affair with Nguyen's on-and-off girlfriend.

Nguyen maintained it would be an "easy lick" but, on seeing the many cars around the home, he decided to wait to see if people would leave. But they never did. That

---

[1] To provide a measure of anonymity for certain individuals, we will refer to them using their first names and last initials. (See Cal. Rules of Court, rule 8.90.) For subsequent references, we will use their first names only.

3

night, it turned out, was the birthday of one of Dong's brothers, Tien L. He turned 21. Tien L. and his father, Thanh L., spent the night at the house after celebrating. Thanh slept in the living room on a sofa and Be and the three brothers each slept in a bedroom.

After Nguyen, Johnson, Tucker, and Tayler C. waited for a period, visited a convenience store, and smoked marijuana, Nguyen decided to move forward with the plan. Before leaving the car, both Nguyen and Johnson used the woman's bras as masks, with Nguyen taking Tayler C.'s bra and Johnson taking Tucker's. Nguyen then racked a round into the chamber of each gun and offered one to Johnson. Although Johnson initially declined to take the gun, he eventually took the gun after Nguyen again encouraged him to take it. At Nguyen's direction, Tucker then called Johnson's phone and left the line open so she could hear the events on Nguyen and Johnson's end and know when to pull up her car to pick them up. Nguyen put Johnson's phone in his pocket. Tucker, in turn, put her phone on speaker and placed it on the dash. Before leaving the car, Nguyen gave everyone a Xanax. Tayler C. took half a Xanax pill and everyone else, Tayler C. believed, took a whole pill.

Nguyen and Johnson, each armed with a gun, then left the car. After climbing over a side gate, they entered an unoccupied garage. Johnson, at Nguyen's direction, collected items from the garage in a cardboard box. But neither found the $30,000 that Nguyen expected. After a period of time, Nguyen said, "[L]et's go in," and they both then attempted to open a door to the home. Johnson first attempted to pry open the door using a crowbar. But after he was unsuccessful, Nguyen managed to open the door by bumping it with his shoulder. He and Johnson then entered the home, finding themselves in the laundry room.

After Johnson briefly searched the laundry room's cupboards, they entered a door leading to the rest of the house and found Thanh sitting asleep on a sofa in the living room. Nguyen woke him up and told him to get on the ground. But Thanh, not appearing to understand, stood up and put his hands behind his head. Nguyen repeated

4

his command and then hit Thanh on the head with his gun.  With Thanh now on the floor, Nguyen removed Thanh's wristwatch and instructed Johnson to watch him.  Johnson complied.

Nguyen then headed into one of the bedrooms and, moments later, shot Tien as he lay in his bed.  On hearing the shooting, Johnson ran toward Nguyen and saw Nguyen standing over Tien's lifeless body.  Tien's girlfriend, who was asleep miles away, heard the gunshots too.  She and Tien kept an open phone line every night as they slept and, on this night, she awoke to yelling and the sound of "slaps," which she later learned were gunshots.

Nguyen and Johnson afterward moved to Dong's room.  Around this time, Tucker and Tayler C. heard "a bunch of yelling" over the phone.  After the first set of gunshots, Tayler C. thought she heard Johnson say, "Get the fuck on the ground," and Nguyen ask, "Where the fuck is all the money?"  She also heard an unknown man say Nguyen's name "over and over again" and then heard a second set of gunshots.  Tucker had a similar recollection, though with some additional details.  After the first set of gunshots, Tucker heard Nguyen say, "Where's the money at; where's the money at?"  Dong, in response, said Nguyen's name and screamed, "I don't have it; I don't have it.  Get out of my house. Get out of my house."  Tucker then heard Johnson ask, "Where's the money at, where's it at?"  Immediately after Johnson's questioning, she heard "somebody groan[] like as if they got hit or they're hurt."  She also heard Nguyen say something along the lines of "Give me the gun."  At the close of the exchange, Nguyen said, "My bad, bro," and then Tucker heard two to three gunshots.

Thanh and Be ran from the house moments after the second set of gunshots. Johnson and Nguyen followed shortly behind, though the witnesses differed on who exited first—Johnson and Tucker said Johnson exited first, but Tayler C. said Nguyen left first with Johnson right behind.  Nguyen shot Thanh in the back as he left the home and

he and Johnson then entered the car. The entire crime—gauged by the length of the call between Johnson and Tucker—was no more than 55 minutes.

As they fled the scene, according to Tucker, Nguyen yelled at Johnson for failing to "shoot anybody," saying, "That's what we went in there for." He added, "I had to take the gun from you." But Johnson pressed back, saying he "didn't come here" to commit murder; "[i]t was supposed to just be a robbery." Johnson indicated he was willing to use force—and in fact said he pistol-whipped Dong at one point—but maintained that the plan was not to murder anyone. With tempers still high, and Nguyen and Johnson arguing over who should receive what, appellants divvied up the items taken from the home, including, among other items, $200 in cash, a wallet, Dong's necklace, Thanh's watch, and a motorcycle helmet.

The police arrived at the home shortly after, finding Thanh in the front walkway with three gunshot wounds to the back, Tien in one bedroom with two gunshot wounds to the head, and Dong in another bedroom with three gunshot wounds to the head and torso. All three were dead.

About a week later, Tucker, Tayler C., Johnson, and Nguyen were arrested. Tucker promptly admitted to much of what occurred, though she initially replaced Johnson with a fictitious person to protect him. She said both Nguyen and Johnson participated in the crime and entered the victims' home, but only Nguyen shot the victims. Tayler C. also discussed the crime, though she initially tried to disclaim any knowledge of it. Johnson, however, denied being involved following his arrest. And Nguyen similarly, also declined to disclose his involvement in the murders.

Johnson, however, ultimately decided to testify at trial and corroborated much of the above. He said he agreed to participate in the robbery after Nguyen told him he would receive a $10,000 cut and have his debt forgiven. He acknowledged he knew they would be robbing Dong, Nguyen's friend, and drug supplier. He admitted he put on gloves, armed himself with a loaded gun, and then, with Nguyen, entered the victims'

6

garage and later their home. He admitted he later guarded over Thanh while displaying his gun as a show of force. And he said he was nearby when Nguyen shot Tien, Dong, and Thanh. He was in the living room when Nguyen shot Tien, he was just outside Dong's bedroom when Nguyen shot Dong, and he had just crossed the home's yard and reached Tucker's car when Nguyen shot Thanh outside.

But Johnson maintained that he had no involvement in the violence. He said, for example, that he only reluctantly took a gun after Nguyen pressured him and never used it. Although he acknowledged he claimed to have pistol-whipped Dong, he said he only made the comment to "shut [Nguyen] up" after Nguyen accosted him for not doing "anything" in the house. According to Johnson, the gun remained in the waistband of his pants until the moment Nguyen took it—which occurred before he even went to Dong's room. In Johnson's telling, Nguyen took Johnson's gun immediately after the shooting of Tien. Nguyen at that time said, "My gun jammed. Give me yours." When Johnson failed to respond, Nguyen took the gun from Johnson's waistband. Johnson also attempted to explain his continued presence in the home after Tien's murder—he was frozen in fear. He only fully "came to" in the moment before Nguyen shot Dong, at which point he attempted to leave the house. Although, following the shooting of Tien, Tucker said she heard Johnson ask, "Where's the money at, where's it at?" Johnson claimed that was not true; he was still in a daze at that time.

Nguyen declined to testify at trial. But before trial, he disclosed his role in the murders to several others. According to Tucker, Nguyen said he first went into one bedroom and shot Dong's younger brother. He then took Johnson's gun, because his own had jammed, and shot Dong and later the father. According to Tayler C., Nguyen also admitted he shot the three men and took Johnson's gun. And according to Harleigh Anderson, Nguyen's friend and on-and-off girlfriend, Nguyen similarly admitted he shot Dong and others. Nguyen, Anderson added, said that Johnson "didn't do anything. He just was there."

7

## II

### *Procedural Background*

In October 2017, the Sacramento County District Attorney filed an information against Nguyen and Johnson. The information alleged, in counts one through three, that appellants murdered Dong, Thanh, and Tien (Pen. Code, § 187, subd. (a))[2]; in count four, that appellants, each acting in concert with two or more other persons, robbed Dong, Thanh, and Tien (§§ 211, 213, subd. (a)(1)); and in count five, that Nguyen possessed a firearm after being convicted of a felony (§ 29800). The information also alleged several "special circumstances" and sentencing enhancements. It alleged, as to the murder counts, that appellants committed multiple murders (§ 190.2, subd. (a)(3)) and committed the murders during a robbery (§ 190.2, subd. (a)(17)). It alleged, as to both the murder and robbery counts, that Johnson used a firearm (§ 12022.53, subd. (b)) and Nguyen used and intentionally discharged a firearm causing death (§ 12022.53, subds. (b)-(d)). And it alleged that Nguyen had four prior strike convictions for first degree burglary. (§§ 459, 667, subd. (e)(2), 1170.12, subd. (c)(2).)

Both appellants pleaded not guilty to the charges. But Tucker and Tayler C., who were charged with appellants in the prosecution's initial complaint, admitted their involvement in the crimes and entered into plea deals. Both plea agreements were similar. To avoid a potentially greater sentence, Tucker and Tayler C. each agreed to testify truthfully in appellants' trial and agreed to a guilty plea for armed robbery for a seven-year sentence.

After the presentation of evidence and the replacement of several jurors, the jury announced a verdict. It found both Nguyen and Johnson guilty on all counts. It also, as to Johnson, found true the allegations that the murders were committed during a robbery

---

[2] Undesignated statutory references are to the Penal Code.

8

and that Johnson used a firearm in the commission of the robbery and the murder of Tien. But it found not true the remaining allegations concerning Johnson. The jury further, as to Nguyen, found true all alleged special circumstances and sentencing enhancements, apart from the prior strike allegations, which the jury did not consider. The court afterward, in a bench trial, found true the allegations that Nguyen had four prior strike convictions.

The court sentenced Johnson to three consecutive terms of life in prison without the possibility of parole for the murders counts, with an additional 10 years for the firearm allegation on the count involving the murder of Tien. The court stayed the sentence on the robbery count pursuant to section 654.

The court sentenced Nguyen to three consecutive terms of life in prison without the possibility of parole for the murders counts, with an additional 25 years to life for each firearm allegation on these counts. It further sentenced him to the upper term of three years, doubled under the "Three Strikes" law, for a total of six years for the firearm possession count. Finally, as with Johnson, it stayed the sentence for the robbery count pursuant to section 654.

Appellants timely appealed.

## DISCUSSION

## I

### *Admission of the Unredacted Plea Agreements into Evidence*

We consider first whether the trial court improperly allowed the jury to view Tucker's and Tayler C.'s unredacted plea agreements. In particular, we consider whether the court wrongly allowed the jury to see portions of the plea agreements noting that a judge would determine whether Tucker and Tayler C. had testified truthfully. We find no reversible error.

*A. Additional Background*

Before turning to appellants' argument, we start with a little additional factual background. Tucker and Tayler C., again, entered into plea agreements before appellants' trial. Both agreements, relevant here, required Tucker and Tayler C. to testify truthfully at the trial and noted that a judge would determine whether they complied with this obligation.

Based on these terms, the prosecutor attempted to emphasize at trial that neither he nor his office would determine whether Tucker and Tayler C. had testified truthfully under the plea agreements, and so the jury should not conclude that these witnesses were testifying to "please" him. To that end, the prosecutor asked Tayler C., "And at the end of the day who decides if you've been truthful?" But after the court sustained an off-the-record objection, the prosecutor asked:

> "Q. I'm going to change my question a little bit, [Tayler C.]. You understand at some point a decision will be made whether you complied with your obligation to be truthful at this—in this case.
>
> "A. Yes.
>
> "Q. And you understand I'm not the one that makes that decision; right?
>
> "A. Yes.
>
> "Q. You don't have to please me in any way, shape or form.
>
> "A. Right."

The prosecutor later questioned Tucker similarly about her plea agreement. He asked, "You know I'm not the one making that decision" about whether you have complied with the plea agreement? And following Tucker's response to the question, he asked, "Do you have any feeling inside of you that you need to please me or my office?" Tucker responded, "No. I feel like I told the truth. And I lied in the beginning in my first statements, but since I've been here and the preliminary hearing, I've told the truth."

10

After the close of evidence, the prosecutor sought to admit Tucker's and Tayler C.'s unredacted plea agreements into evidence. But appellants objected. They argued that three paragraphs in the agreements, which noted that a judge would determine whether Tucker and Tayler C. testified truthfully, amounted to the court vouching for the witnesses. They thus asked the court to redact these paragraphs. The three objected to paragraphs stated:

"10. A Judge of the Sacramento County Superior Court shall be the final arbiter, within his/her discretion of whether I fully performed under this Agreement. And if I fully performed my obligations, the disposition of my pending criminal case will proceed as described below.

"11. A Judge of the Sacramento County Superior Court shall be the final arbiter, within his/her discretion, to determine whether I testified truthfully in any proceeding, or whether I engaged in any intentional deceit in an effort to effectuate this agreement.

"12. If I have been found by a Judge of the Sacramento County Superior Court to have failed to comply with the terms of this plea Agreement, whether totally or partially, then this entire Agreement will be null and void. The effect of nullification of this Agreement will be, at the discretion of the Sacramento County District Attorney's Office either: [¶] (a) that I will be deemed to have withdrawn my admission of guilt and face prosecution on the original case and any charges related to the events surrounding the original case with no limitation on a possible sentence, or [¶] (b) my pleas of guilty in my case will stand, and I will be sentenced within the full range of penalties before a Judge of the Superior Court of Sacramento County."

The court, however, denied appellants' request. It acknowledged that it had earlier sustained a similar objection during the prosecutor's questioning, but, on further reflection, it declined "to redact out the portions that [defense counsel] [wa]s requesting

11

primarily for the reason that these witnesses were cross-examined at length about this agreement that they entered into where credibility was challenged significantly." The court added that "the jury [wa]s entitled to know what the terms of conditions were of their agreements" and that granting the redaction request would "cast an unfair light on what the agreement was between the parties."

 *B. Analysis*

Appellants now renew their objection to the admission of the unredacted plea agreements. They argue "that the problem of inserting a 'judicial review' provision in any plea agreement is that it invites the jury to assume that if perjury is discovered after the fact, any verdict that is reached can be corrected." They add that allowing the jury to see the unredacted plea agreements was so prejudicial that it rendered their trial fundamentally unfair in violation of the Due Process Clause of the California Constitution. Lastly, to the extent the trial court admitted the unredacted plea agreements on the ground that defense counsel had "open[ed] the door" through their cross-examinations of Tucker and Tayler C., appellants content the court was mistaken. We reject appellants' argument. To the extent the court erred in admitting the unredacted plea agreements, we find no prejudicial error.

To start, we acknowledge that plea provisions of this sort can "arguably carr[y] some slight potential for jury confusion." (*People v. Fauber* (1992) 2 Cal.4th 792, 823 (*Fauber*).) The Supreme Court found as much in *Fauber*, which also involved the disclosure of the terms of a plea agreement. The defendant there " 'argue[d] that the plea agreement made the trial court a monitor of [a witness's] truthfulness, and thereby placed its prestige behind [the witness's] testimony, by providing that '[i]n the event of a dispute, the truthfulness of [the witness's] testimony will be determined by the trial judges who preside over these hearings.' " (*Id.* at p. 822.) The court agreed that, had the defendant objected to this provision (which he had not), "the trial court would have acted correctly in excluding it on a relevancy objection." (*Id.* at p. 823; see also *id.* at p. 821

12

[although the court found the defendant forfeited his argument by failing to raise it at trial, it nonetheless decided to address the merits of the argument].)  Although the court found it "crucial that the jury learn what would happen to [the witness] in the event he failed to testify truthfully," it found "the precise mechanism whereby his truthfulness would be determined was not a matter for its concern." (*Ibid.*)  It then added: "The provision detailing the judge's determination of [the witness's] credibility in the event of any dispute arguably carried some slight potential for jury confusion, in that it did not *explicitly* state what is implicit within it:  that the need for such a determination would arise, if at all, in connection with [the witness's] sentencing, not in the process of trying defendant's guilt or innocence." (*Ibid..*)

But despite this potential for confusion, the court found "no possibility that defendant was prejudiced by [the plea agreement's] admission." (*Fauber, supra*, 2 Cal.4th at p. 823.)  It reasoned: "The jury could not reasonably have understood [the witness's] plea agreement to relieve it of the duty to decide, in the course of reaching its verdict, whether [the witness's] testimony was truthful." (*Ibid.*)  The court added that the trial court's jury instructions, which the prosecutor parroted in his opening statement, "reinforced" this conclusion. (*Id.* at pp. 823-824.)  The trial court "instructed the jury, before the start of the prosecution's case and after closing argument, that '[e]very person who testifies under oath is a witness.  You are the sole judges of the believability of a witness and the weight to be given to his testimony. . . .' ". (*Id.* at p. 823.)  "[I]n the absence of any contrary indication in the record," the court concluded "that the jury understood and followed this instruction." (*Ibid.*)

Under the *Fauber* court's reasoning, we likewise find no possibility that appellants were prejudiced by the admission of the plea agreements.  To use the *Fauber* court's words, "[t]he jury could not reasonably have understood [the witnesses'] plea agreement[s] to relieve it of the duty to decide, in the course of reaching its verdict, whether [the witnesses'] testimony was truthful." (*Fauber, supra*, 2 Cal.4th at p. 823.)

13

The trial court's jury instructions "reinforce[]" this conclusion. These instructions, like those in *Fauber*, told the jury that "[y]ou alone[] must judge the credibility or believability of the witnesses." (*Ibid.*) Considering the jury instructions, and following the *Fauber* court, "[w]e presume, in the absence of any contrary indication in the record, that the jury understood and followed this instruction." (*Ibid.*) To the extent the trial court erred in admitting the plea agreements, then, we find no reversible error.

Appellants, seeking a different conclusion, selectively cite to *Fauber* and largely ignore the court's finding of no potential prejudice in their opening briefs—leaving a somewhat misleading picture of the case as a result. Their reply briefs are worse still in this regard. Appellants, for instance, claim: "[R]espondent acknowledges that the California Supreme Court [in *Fauber*] designated judicial review provisions as both irrelevant *and prejudicial*." (Italics added.) But the Attorney General said no such thing. He stated only (and correctly) that the *Fauber* court found no prejudice. Although, again, the *Fauber* court found the judicial review provision there "was not a matter for [the jury's] concern" and "arguably carried some slight potential for jury confusion," it found "no possibility that defendant was prejudiced by its admission." (*Fauber, supra*, 2 Cal.4th at p. 823.)

Apart from their misguided reliance on *Fauber*, appellants also cite other cases involving factually distinct circumstances. They extensively cite, for example, the California Supreme Court's ruling in *People v. Ramos* (1984) 37 Cal.3d 136. The court there disapproved of an instruction that told the jury in a capital case that the governor could commute a life sentence without the possibility of parole to a sentence allowing for parole. (*Id.* at pp. 150, 153.) The court reasoned that "the instruction would reasonably be understood by the average juror to mean, by negative implication, that while a sentence of life without possibility of parole may be commuted, a sentence of death may not"—which "may lead a jury that does not believe that the death penalty is necessary, but fears a future commutation, to return a death penalty in the mistaken belief that that

14

sentence alone will preclude any possible release." (*Id.* at pp. 153-154.) The court added that, even if the instruction were modified to be "totally accurate," it "would still violate the state constitutional due process guarantee because its reference to the commutation power invites the jury to consider matters that are both totally speculative and that should not, in any event, influence the jury's determination." (*Id.* at p. 155.) But our Supreme Court, importantly, did not reach a similar conclusion in its later decision in *Fauber*. And because it is *Fauber* and not some other factually distinct case that governs here, we find no reversible error.

## II

### *Removal of a Juror*

We consider next whether the trial court wrongly removed a juror during deliberations. We find it did not.

#### A. Additional Background

During deliberations, the trial court received a note from the jury saying, in relevant part: "We . . . have a juror that does not feel that she can follow the law due to the possible 'sentencing' that could be assigned to breaking this law." The trial court afterward decided to conduct a "very limited inquiry" into the matter, which led to the questioning of, in order, Jurors Nos. 2, 7, 10, 11, 12, 5, and 1.

Juror No. 2 found the claim in the note accurate and said Juror No. 7 wrote it. ([Juror No. 5 contributed a separate part of the note that is not relevant for our purposes]). Juror No. 1, Juror No. 2 said, "does not feel she can follow the law due to the possible sentencing"—a comment she had made "[a]t least twice." In particular, Juror No. 2 told the trial court, she stated she "can't convict somebody that did not pull the trigger" and "can't put somebody out that didn't pull the trigger for that amount of time." Juror No. 2 noted that, on being confronted with the jury instructions, Juror No. 1 tried to walk back her comment and "said, no, she never said that." But Juror No. 2 added, when asked

15

whether she would "go by what the law says," "she won't give a straight answer." In his view, "she's not" "following the law with respect to sentencing."

Juror No. 7 shared a similar understanding. In his telling, Juror No. 1 had reached a certain decision about the case but, after considering sentencing, decided to change her decision "so it doesn't result in some possible sentencing." "In other words, the sentencing was the focus as to whether or not [she is] gonna go back on a decision [she] had made." Juror No. 7 added, "that sentencing is still an issue for this juror." Juror No. 7 further noted that other jurors have treated Juror No. 1 respectfully, but she has exhibited "some animosity and some defensiveness."

Juror No. 10 said much of the same. According to Juror No. 10, Juror No. 1 "disagrees with the law. If someone did not physically commit the crime the way the law is written, she just couldn't convict." Juror No.10 added that Juror No. 1 has also said that, if asked by the court about the issue, she would say the "opposite [of] what she said in the room."

Juror No. 11 likewise believed that Juror No. 1 "just doesn't want to follow the law." In particular, Juror No. 11 said, she is not willing to "say guilty" on certain charges because of "penalty and punishment" and is "not ready to convict somebody because she relates to that person"; "she feels like she's doing it to herself or some of her family members." Juror No. 11 added that others have been respectful in raising the need to follow the law but Juror No. 1 "becomes really upset sometimes" and, on one occasion, challenged another juror to "discuss this outside"—which Juror No. 11 understood to be a challenge to fight.

Juror No. 12 also concluded that Juror No. 1 "is not willing to follow the law because of sentencing issues or punishment or penalty issues." In Juror No. 12's understanding, Juror No. 1 believes "the law needs to change" and "a person is not guilty of. . . murder just because there was somebody who commits the act." Juror No. 12

16

added that Juror No. 1 mentioned she knows "one of the defendants or their family members" and stated, "she was scared," but then later said, "I take that back."

Juror No. 5, like Jurors Nos. 2, 7, 10, 11, and 12, also believed Juror No. 1 "is refusing to follow the instructions on the law." Specifically, Juror No. 5 said, Juror No. 1 "doesn't agree with the outcome, the . . . possible sentence," and "doesn't agree with the law." Juror No. 5 added that, in her view, Juror No. 1 is "trying to disqualify herself as a juror." To that end, Juror No. 5 said, Juror No. 1 is claiming to know "either a witness or somebody in the audience" and saying she is "scared if they knew her decision" in this case because "she's well known in the neighborhood." Juror No. 5 further noted that, although other jurors were treating Juror No. 1 respectfully, Juror No. 1 "is not respectful to the other jurors in the jury deliberation room."

Juror No. 1 provided a somewhat different characterization of the facts. But before turning to the differences, we start with the similarities. Backing up some of the comments of Jurors Nos. 11 and 12, she said she knew "one of the ladies that was coming on the victim's side"—something, she said, she told the bailiff—and acknowledged she expressed "concern[] about voting one way or another and being scared about that." Confirming another comment from Juror No. 11, she said she "felt bad" for Johnson "[b]ecause we grew up the same way." And confirming other comments from Jurors Nos. 2, 5, 7, 10, 11, and 12, she acknowledged she "stated that [Johnson] shouldn't go for the rest of his life for not murdering somebody he didn't murder."

But from there, she largely departed from the statements of the other jurors. She said, for example, that she had "never said anything about changing any laws," is "willing to follow the law," and is no longer "concerned about penalty and punishment." Those, at least, were her initial representations to the trial court. But shortly after, she backtracked somewhat. Although at first stating she was no longer "concerned about penalty and punishment," she then went on to acknowledge that she "continue[d] to be concerned about the possible sentencing" and is "concerned in [her] own mind right now

17

that the sentencing in this case affects [her] ability to be fair." Acknowledging her inconsistent statements, Juror No. 1 added that she is "back and forth."

Juror No. 1 also raised an additional issue, noting she had an upcoming vacation and asked whether there was "any way we can just change me out today." After the trial court asked for an explanation, she noted the other jurors are "just going to keep pressuring and pressuring me" and "I might just . . . go along because everything that's going on." The trial court then followed up: "Do you believe if you go back in that jury deliberation room that you're just going to go ahead and go along with the group just to get this over with?" Juror No. 1 responded, "Honestly, yes." She further noted that she "even changed [her] verdict a little bit because . . . people were just pressuring [her] to say things."

After Juror No. 1 left the courtroom, the trial court asked the bailiff whether Juror No. 1 had, as she claimed, "indicate[d] she knew anybody in the audience[.]" But the bailiff could not recall her doing so. He added that, when jurors share that type of information, it is his practice to tell the judge. The trial court later asked a similar question to another bailiff, who had filled in on one day. But he too did not recall hearing from any juror about knowing someone in the audience. And he too said that, had a juror shared this type of information, he "would have alerted the Court."

The court then heard from the parties. The prosecution argued that Juror No. 1 should be dismissed for several reasons—she could not follow the law, she is attacking the other jurors, she appears dishonest, and she admitted she "would just go along with the group." The prosecution added that, were she not dismissed and "the jury somehow reaches verdicts, there is a one hundred percent appellate issue that the defendants will then claim that she did exactly what she told the Court she would do"—that is, submit to peer pressure—"and, therefore, the verdicts are unreliable and unjust." Counsel for both defendants, on the other hand, moved for a mistrial and principally attributed any jury misconduct to the jurors other than Juror No. 1. In the view of one of the defense

18

attorneys, "if we keep her, there will be a claim there was misconduct" for the reasons the prosecution mentioned; but "[i]f we leave her off, . . . there's [also] a very good claim of misconduct."

After the parties submitted their arguments, the trial court decided to dismiss Juror No. 1 and swear in an alternate juror. To start, the trial court found Juror No. 1's statements, at least in part, dishonest. Juror No. 1 said she told the bailiff that she knew someone in the audience, but the trial court "d[id] not believe her" and found "her credibility just on that issue alone to be extremely suspect." Next, the trial court discussed two different reasons for finding removable misconduct. First, the trial court said Juror No. 1 admitted she "change[d] her verdict because she is feeling pressure," which is "misconduct" that "goes to the heart and soul of our justice system" and "cannot be allowed." Relatedly, the trial court noted, apart from admitting she "change[d] her verdict because she is feeling pressure," Juror No. 1 also "indicated to me after I asked the question are you just gonna go ahead and go along with the group just to get this over with, and her answer was honestly yes." The trial court added that "the pressure she is feeling is the pressure of being encouraged and told that she must follow the law." Second, turning to another ground for finding misconduct, the trial court said it "believe[d] the jurors when they sa[id] she is not following the law"; "[s]he is allowing sympathy and her own personal issues to guide her and make decisions in this case." "We cannot," the court concluded, "have jurors that do that."

*B. Analysis*

Under section 1089, "[i]f at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box." On appellate review of a trial court's decision to discharge a juror, "[w]e will uphold the trial court's decision if the record supports the basis for that decision as a

19

' "demonstrable reality." ' [Citation.] This means simply that the record must reveal the reason for the trial court's decision to discharge a juror and in turn substantial evidence must support that reason. [Citation.] So long as it does, ' "the court's action will be upheld on appeal." ' [Citation.]" (*People v. Peterson* (2020) 10 Cal.5th 409, 472-473.)

Appellants here contend the trial court wrongly removed Juror No. 1 "without conducting an adequate inquiry into bias." Although, appellants assert, Juror No. 1 expressed concern "that the sentencing in this case affects [her] ability to be fair," a juror's mere concern about sentencing is not sufficient to discharge the juror. Citing *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed. 841], appellants reason that the issue is not whether the "juror is uncomfortable with the likely penalty"; it is instead "whether 'that juror's views would prevent or substantially impair the performance of h[er] duties as a juror in accordance with h[er] instructions and h[er] oath.' " (*Id.* at p. 424.) Moreover, appellants add, although several jurors believed Juror No. 1 could not follow the law, this too is not enough. "Ultimately," appellants argue, "a trial court seeking to excuse a seated juror" for an alleged inability to follow the law "must confirm such impairment from the juror's own mouth."

We reject their arguments. To start, appellants largely ignore one of the court's grounds for removal—Juror No. 1 admitted she "change[d] her verdict because she [wa]s feeling pressure" and would "go along with the group just to get this over with." Juror No. 1, in other words, admitted she could not follow the court's instruction "to decide what happened, based only on the evidence that has been presented to you in this trial," and "not [to] let . . . public opinion influence your decision." The court, for this reason, found Juror No. 1 had engaged in "misconduct" that "goes to the heart and soul of our justice system" and "cannot be allowed." Johnson's own counsel appeared to agree: "[I]f we keep her," he warned, "there will be a claim there was misconduct."

We find the trial court's decision to discharge Juror No. 1 on this ground was sound. A juror's "failure to follow the court's instructions is misconduct and a basis for

20

dismissal." (*People v. Peterson, supra*, 10 Cal.5th at p. 472.) Here, Juror No. 1 clearly acknowledged that she could not follow the court's instructions. She admitted that she had "changed [her] verdict a little bit because . . . people were just pressuring [her] to say things" and she added that, if she continued to be part of the jury, she would "go along with the group just to get this over with." Considering this testimony, we find sufficient evidence in the record supports the trial court's decision to discharge Juror No. 1 for voting based on peer pressure rather than the evidence and the law. A juror's failure, after all, to follow the trial court's instruction "to decide what happened[] based only on the evidence" undermines, as the trial court put it, "the heart and soul of our justice system" and "cannot be allowed.") (See *People v. Engelman* (2002) 28 Cal.4th 436, 442 ["a juror who proposes to reach a verdict without respect to the law or the evidence" is "subject to discharge"].)

Appellants, in a footnote, suggest the trial court's dismissal of Juror No. 1 on this ground was inappropriate because the trial court never "ask[ed] Juror No. 1 if she could ignore the pressure being placed on her." We reject the argument. To start, we find the argument forfeited because appellants raise it in a footnote only. (*Gonzalez v. Mathis* (2018) 20 Cal.App.5th 257, 274, fn. 4 [" 'We . . . need not address . . . contention[s] made only in a footnote.' "]; *People v. Lucatero* (2008) 166 Cal.App.4th 1110, 1115, fn. 1 ["A footnote is not a proper place to raise an argument on appeal."].) But even had appellants properly raised the issue, we would still find the premise of their argument falls short. In particular, contrary to appellants' suggestion, we find Juror No. 1 was sufficiently clear that she could not ignore peer pressure. Again, Juror No. 1 conceded she had already "changed [her] verdict a little bit because . . . people were just pressuring [her]." And she added that, if she returned to deliberate further, she would "go along with the group just to get this over with." The trial court several times followed up on this last point. After reminding Juror No. 1 that appellants "have a right to not only a collective decision but an individual decision," the trial court asked, "Are you telling me right now, Judge, I'm

21

done. I'm going to go along with the group?" But Juror No. 1 evaded the question, saying, "At the end—at the end they're just—you're not in the room." The trial court then tried again. After emphasizing the importance of confirming Juror No. 1's position, the trial court asked, "Are you just gonna basically say fine just to get this over with and go?" But Juror No. 1 still declined to express an ability to vote independently, saying only, "I really don't want to, but just it's just pressure." In the end, Juror No. 1 had several opportunities to show she could decide the case based on the evidence and the law. But she never did. She instead made clear that she would follow (and in some respects, had already followed) the majority's position.

Although we need not decide the issue, we also question appellants' challenge to the trial court's additional ground for discharging Juror No. 1, which concerned Juror No. 1's ability to follow the law based on sentencing concerns. Appellants, again, contend Juror No. 1 could have been discharged only if she herself admitted that her concerns over sentencing substantially impaired her ability to follow the law. In their view, "[d]isqualification had to be based upon juror 1's explicit admission of substantial impairment."

Courts, however, have long found differently in similar contexts. In *People v. Thomas* (1990) 218 Cal.App.3d 1477 (*Thomas*), for example, the court found a juror could be dismissed for being biased against police officers even though "she disclaimed any particular bias toward police officers." The court reasoned that "[i]t is obvious that no amount of questioning was likely to lead to an outright admission of bias, and the [trial] court properly relied upon the testimony of the other jurors in determining the issue." (*Id.* at p. 1485.)

The Supreme Court in *People v. Barnwell* (2007) 41 Cal.4th 1038, citing *Thomas* with approval, found similarly. There too, the court found a juror could be dismissed for being biased against police officers even though the juror denied having a general bias against officers. "Often," the court said, "the identified juror will deny [the alleged bias]

22

and other jurors will testify to examples of how he or she has revealed it.  [Citation.]  In such a case the trial court must weigh the credibility of those whose testimony it receives, taking into account the nuances attendant upon live testimony."  (*Id.* at p. 1053.) Applying those principles to the facts before it, and considering the "clear thrust of the [trial] court's ruling" that it found credible the testimony of several jurors "who stated that [the discharged juror] expressed or exhibited . . . a bias," the court found the juror's "disqualifying bias was established to a 'demonstrable reality.' "  (*Ibid.*)

Both *Barnwell* and *Thomas* undermine appellants' broad claim that "[d]isqualification had to be based upon juror 1's explicit admission of substantial impairment."  But again, because we find at least one of the trial court's stated reasons for dismissing Juror No. 1 was established to a "demonstrable reality," we need not address this particular issue here.

III

*Johnson's Murder Convictions & the Special Circumstances Findings*

Next, we consider whether substantial evidence supports Johnson's murder convictions and the associated special circumstances findings.  We find it does.

A.  *Additional Background*

The jury, again, found Johnson guilty of three first degree murders.  It also found true the "special circumstances" allegations that these murders occurred while Johnson was engaged in the commission of a robbery.  Relevant to all these findings—the murder convictions and the "special circumstances" findings—was the jury's conclusion that Johnson either (1) with the intent to kill, aided and abetted Nguyen in the commission of the murders, or (2) was a major participant in the robbery and acted with reckless indifference to human life.

Both these considerations have long been relevant to the "special circumstances" allegations that the jury found true.  Section 190.2 describes certain factual circumstances surrounding a first degree murder that may warrant a "special circumstance" finding.

23

Relevant here, in subdivision (d), the statute states: " '[E]very person, not the actual killer, who, with reckless indifference to human life and as a major participant' aids or abets an enumerated felony, including [robbery and] attempted robbery, that results in death may be convicted of special circumstance murder and sentenced to death or to life imprisonment without the possibility of parole." (*In re Scoggins* (2020) 9 Cal.5th 667, 674 (*Scoggins*).) Section 190.2, subdivision (c) provides the very same for "[e]very person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree."

These same considerations are now, since 2019, also relevant to felony murder—the theory of murder applicable here. Section 189 provides the statutory definition for first degree felony murder. It states: "All murder . . . that is committed in the perpetration of, or attempt to perpetrate,. . . robbery [and certain other qualifying crimes]. . . is murder of the first degree." (§ 189, subd. (a).) Effective January 1, 2019, following the passage of Senate Bill No. 1437, it further states: "A participant in the perpetration or attempted perpetration of [the qualifying crime] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (Stats. 2018, ch. 1015, § 3 [amending § 189 effective January 1, 2019].)

The jury was instructed consistent with these statutes. Although appellants' trial preceded the effective date of Senate Bill No. 1437, the parties agreed to instruct the jury as if it were already in effect. As a result, both his murder convictions and the associated "special circumstances" findings required the jury to determine that he either (1) "with

24

the intent to kill," aided and abetted Nguyen in the commission of the murders (§§ 189, subd. (e)(2), 190.2, subd. (c)), or (2) was a "major participant" in the robbery and acted "with reckless indifference to human life" (§§ 189, subd. (e)(3), 190.2, subd. (d)).

### B. Analysis

With that background, we turn to Johnson's argument. He contends his murder convictions, and the associated special circumstances findings are not supported by substantial evidence. After asserting that "the prosecutor virtually conceded" that he did not intend the victim's deaths, he argues that the evidence fell short of showing that he either acted "with reckless indifference to human life" or was a "major participant" in the robbery. We find differently.

In addressing these types of issues, courts have "described the range of felony-murder participants as a spectrum. At one extreme [is]. . . 'the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.' [Citation.] At the other extreme [a]re actual killers and those who attempted or intended to kill." (*People v. Banks* (2015) 61 Cal.4th 788, 800 (*Banks*).) In the former example involving the "minor actor," a jury could not find the defendant was a "major participant" in the robbery. Nor could it find the defendant acted "with reckless indifference to human life." But in the latter scenario involving "those who attempted or intended to kill," a jury could readily find both elements satisfied. (*Ibid.*)

Johnson's culpability lies somewhere between these two extremes. In evaluating his level of culpability, we focus on both his conduct and his mental state. To determine whether his conduct was sufficient to support the jury's verdict, we consider whether he was a "major participant" in the robbery. And to determine whether his mental state was sufficient to support the jury's verdict, we consider whether he acted "with reckless indifference to human life." (See *Banks, supra*, 61 Cal.4th at p. 798.)

### 1. Major Participant

We consider first whether Johnson was a "major participant" in the robbery.

"The ultimate question pertaining to being a major participant is 'whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major[.]" ' [Citation.]" (*People v. Clark* (2016) 63 Cal.4th 522, 611 (*Clark*).) In answering that question, we consider the totality of the circumstances. Relevant considerations include: " 'What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inactions play a particular role in the death? What did the defendant do after lethal force was used?' [Citation.]" (*Ibid.*) "No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Banks, supra*, 61 Cal.4th at p. 803.)

Considering these *Banks* factors and viewing the record in the light most favorable to the judgment, as we must when reviewing a challenge to the sufficiency of the evidence, we find substantial evidence supports the jury's finding that Johnson was a "major participant" in the robbery. (See *Banks, supra*, 61 Cal.4th at p. 804 ["When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' "].)

First, starting with the one *Banks* factor that tends to favor Johnson, Johnson's role in planning the crime was generally limited. He did not, for example, plan the time, place, or manner of the crime. That said, he did not altogether sit on the sidelines. He recommended, for example, that they use Tucker's car rather than his own as the getaway vehicle because he believed his car was more likely to be pulled over. And, although

26

Johnson could not remember for certain, he acknowledged that he might have been the one who recommended using bras as masks.

Second, although Johnson did not supply any weapons, he accepted and used a gun during the crime. Johnson, again, used a gun to guard over Thanh and admitted he later pistol-whipped Dong. Although he later attempted to downplay his admission, saying he only claimed to have pistol-whipped Dong to "shut [Nguyen] up," the jury was entitled to accept as true his initial concession. And, although Johnson claims otherwise, the jury could have found as much even though it found not true the allegation that Johnson used a firearm in the murder of Dong. (See *People v. Palmer* (2001) 24 Cal.4th 856, 860 ["The law generally accepts inconsistent verdicts as an occasionally inevitable, if not entirely satisfying, consequence of a criminal justice system that gives defendants the benefit of a reasonable doubt as to guilt, and juries the power to acquit whatever the evidence."].)

Third, we find the evidence sufficiently supports a finding that Johnson understood the particular dangers posed by the crime. To use the words of another court, Johnson's "decision to arm himself with a [gun] should be viewed in combination with the particularly risky crime that he planned and led—a home invasion robbery of a [drug] dealer. This was not a garden-variety robbery. [Citation.] The potential for it to turn violent was obvious." (*In re McDowell* (2020) 55 Cal.App.5th 999, 1011.) Adding to the possible dangers, Johnson knew the potential that he and Nguyen would be significantly outnumbered, creating a more volatile and chaotic environment. Again, he and Nguyen initially hesitated to go forward with the crime because of the number of cars parked around the house. But they nonetheless decided to move forward.

Fourth, Johnson was present at the scene of the murders and in a position to prevent at least two of the murders. As our Supreme Court has explained, " '[p]roximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps, or where the

participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, "the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders." ' [Citation.]" (*Scoggins, supra*, 9 Cal.5th at p. 678.)

In this case, Johnson was present during the entire sequence of events leading up to the murders. He was present when Nguyen racked a round into two guns and handed one to Johnson. He was present when Nguyen first exhibited a propensity for violence, using his gun to hit Thanh. And he was present, though in a neighboring room, when Nguyen first used lethal force against Tien. But even at that point, rather than leave, Johnson joined Nguyen in questioning Dong about his money. And rather than attempt to limit the potential for violence, he ensured further violence—using his gun to pistol-whip Dong. Shortly after, with Johnson only feet away, Nguyen shot Dong and later Thanh. In the end, although having multiple opportunities, Johnson never once attempted to act as a restraining influence.

Johnson, attempting to counter this conclusion, argues that any effort he could have made to restrain Nguyen would have been futile. That is so, he reasons, because Nguyen earlier pistol-whipped Thanh, took Johnson's gun, and, in the car, ignored Tucker's attempt to persuade him from carrying a gun and ignored Johnson's "insistence that he didn't want to carry a weapon." But Johnson never clearly explains the connection between these events and his ability to act as a restraining influence. And to the extent he finds the connection obvious on its face, we find differently. For example, that Nguyen ignored Tucker's attempt to persuade him not to carry a gun does not demonstrate that Nguyen would have also ignored an attempt to persuade him not to shoot people. Nor do any of the other circumstances that Johnson mentions.

Finally, moving beyond the non-exclusive list of considerations identified in *Banks*, we turn to an additional consideration raised by Johnson. In his telling, because Johnson acted more based on Nguyen's directions than on his own initiative, this consideration should weigh in his favor. But we find that Johnson played a central role in the commission of the robbery, even if, as he argues, he largely only followed Nguyen's lead and acquiesced to his instructions. After arming himself with a loaded gun, Johnson entered the victims' garage and collected various items in a cardboard box. He then attempted to break into the home using a crowbar. Following entry into the home, he kept guard over Thanh while Nguyen searched the house. And after Nguyen shot Tien in his bed, he joined Nguyen in interrogating Dong about potential money in the house and then pistol-whipped Dong. Although Nguyen may have provided encouragement for much of this conduct, it remains true that Johnson voluntarily engaged in all of it.

Considering these circumstances together, we find substantial evidence supports the finding that Johnson was a major participant in the robbery that led to the deaths of the three victims.

### 2. *Reckless Indifference to Human Life*

We consider next whether Johnson acted "with reckless indifference to human life."

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citation.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' [Citation.] 'Awareness of no more than the foreseeable risk of death inherent in any

29

[violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement." (*Scoggins, supra*, 9 Cal.5th at p. 677.)

To determine whether Johnson had the requisite mental state, "[w]e analyze the totality of the circumstances" in a manner that largely overlaps with our "major participant" discussion. (*Scoggins, supra*, 9 Cal.5th at p. 677.) The overlap is not unusual. As our Supreme Court has explained, " '[a]lthough we state these two requirements separately, they often overlap,' " " 'for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' [Citation.]" (*Clark, supra*, 63 Cal.4th at p. 615.) That in mind, we turn to several considerations our Supreme Court has found particularly relevant in analyzing whether a defendant acted with reckless disregard to human life: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins,* at p. 677.)

First, as covered in our "major participant" discussion, Johnson carried a gun and knew Nguyen also carried a gun during the crime. Johnson, moreover, knew both guns had a round in the chamber. And although Johnson never fired his gun, he displayed it "as a show of force" (using it to guard over Thanh) and used it to inflict harm (pistol-whipping Dong). These considerations tend to favor a finding that Johnson acted with reckless indifference to human life.

Second, we find significant Johnson's proximity to the murders and the events leading up to them. Johnson's conduct was, in this sense, comparable to the defendants

30

in *Tison v. Arizona* (1987) 481 U.S. 137 [95 L.Ed. 127] (*Tison*)—the case that is the source of the "major participant" and "reckless indifference" language in section 190.2, subdivision (d). (*Clark, supra*, 63 Cal.4th at p. 616 ["*Tison* is the source of the language of section 190.2, subdivision (d)" and thus relevant to "the meaning of the statutory phrases derived from it"].) The defendants there, after helping their father and another escape from prison, flagged down a passing car containing a family of four with the intent of stealing their car. (*Tison,* at pp. 139-140.) They afterward guarded the family while their father considered next steps, including the possibility of killing the family, and then watched as their father and the other escaped prisoner, to defendants' surprise, murdered the family. (*Id.* at pp. 140-141.) Because, the California Supreme Court has said in summarizing *Tison*, the defendants "had ample opportunity to restrain the crime and aid the victims" but "did neither," "the high court [found] they exhibited reckless indifference to human life." (*Scoggins, supra*, 9 Cal.5th at p. 678; see *Tison*, at pp. 157-158.)

Our circumstances, in this respect, are similar to those in *Tison*. Johnson, who remained near Nguyen throughout the crime and its aftermath, had similar opportunity to restrain the crime and aid the victims. Although we accept, as Johnson argues, that he was in a separate room when Nguyen shot Tien, he was in the immediate vicinity, and in fact critical, to Nguyen's shooting of Thanh and Dong. Nguyen, indeed, would have only committed one murder, not three, had Nguyen not been able to take Johnson's gun after his own gun jammed. Johnson could have kept his gun, attempted to restrain Nguyen, or at least left the home after Nguyen murdered Tien. He also could have attempted to aid the victims. But he did none of these things. He instead remained with Nguyen after Nguyen shot Tien, after he shot Dong, and even after he shot Thanh. Under the reasoning of *Tison*, his presence during the entire sequence of events leading up to the murders, together with his failure to act as a restraining influence, tends to reflect a

31

reckless indifference to human life. (See *Tison, supra*, 481 U.S. at pp. 157-158; *Scoggins, supra*, 9 Cal.5th at p. 678.)

Third, favoring Johnson's position somewhat, the duration of the interaction between appellants and the victims was fairly limited. As our high court has explained: "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark, supra*, 63 Cal.4th at p. 620.) Here, the duration of the interaction between appellants and the victims was not particularly long—potentially, the Attorney General acknowledges, no more than 10 minutes. It was, however, enough time to build tension between appellants and the victims and generate, in Tucker's words, "a bunch of yelling." In those minutes, Johnson and Nguyen had time to become increasingly agitated as they searched the home and questioned Dong about his money. Nguyen asked Dong, "Where's the money at; where's the money at?" Dong screamed in response, "I don't have it; I don't have it. Get out of my house. Get out of my house." Johnson further asked, "Where's the money at, where's it at?" But after someone groaned as if hit and Dong continued to assert he had nothing, Nguyen shot him. Overall, although the interaction between appellants and the victims was not prolonged, it appeared long enough to build significant tension between the parties involved. Still, at only about 10 minutes, we agree with Johnson that the duration of the interaction was too short to lend much support to a finding of reckless indifference to human life. (See *Scoggins, supra*, 9 Cal.5th at p. 681 [interaction with victim that lasted no more than five minutes "d[id] not weigh in favor of finding that [the defendant] exhibited reckless indifference to human life"].)

Fourth, at least following Tien's murder, Johnson knew Nguyen was likely to use lethal force. As the Attorney General concedes, "[t]here is little evidence to support that Johnson was aware of Nguyen's likelihood of killing any of the people inside the . . . home prior to entering the . . home to commit the robbery. At most, Johnson was

32

aware that Nguyen was a man who 'collected his debts.' " (But, as the Attorney General argues, a defendant's "knowledge of factors bearing on a cohort's likelihood of killing . . . .may be evident before the felony *or may occur during the felony*." (*Clark, supra*, 63 Cal.4th at p. 621, italics added.) And in this case, at the very least, Johnson understood Nguyen's propensity for violence when he pistol-whipped Thanh—someone who posed no apparent threat and had his hands behind his head. Moreover, at the very least, Johnson understood Nguyen's willingness to use lethal force once he shot Tien in his bed. But even at that point, Johnson took no apparent steps to end his participation in the robbery. He instead joined Nguyen in questioning Dong, engaged in his own acts of violence (by pistol-whipping Dong), and remained with Nguyen when Nguyen afterward shot both Dong and Thanh.

Attempting to counter this finding in his reply brief, Johnson argues that these facts tend only to show his culpability, if any, for the murders of Dong and Thanh—not his culpability for the murder of Tien. But we find differently. To start, considering Nguyen's pistol-whipping of Thanh, Johnson clearly understood Nguyen's propensity for violence before Tien's murder. We also find Johnson's conduct after Tien's murder (including his joining Nguyen to interrogate Dong and then pistol-whipping Dong) is relevant to understanding his mental state before Tien's murder. (See *Scoggins, supra*, 9 Cal.5th at p. 679 ["A defendant's actions after the shooting may also bear on the defendant's mental state."].)

Fifth, Johnson took no meaningful steps to minimize the risk of violence during the robbery. As our Supreme court has found, "a defendant's apparent efforts to minimize the risk of violence can be relevant to the reckless indifference to human life analysis." (*Clark, supra*, 63 Cal.4th at p. 622.) But here, we find little evidence tending to show that Johnson attempted to minimize the risk of violence during the robbery. As to his own actions, Johnson argues he initially refused to take a gun and, when Nguyen asked for his gun in the home, he did not voluntarily hand it over. But even accepting

33

Johnson's version of events, it is still true that he ultimately armed himself with a gun and offered no apparent opposition when Nguyen asked for, and then took, his gun. Johnson also, though without taking ownership of the idea, contends the use of masks lessened the risk of violence. But Johnson understood that Nguyen knew the victims, undermining the usefulness of the masks in hiding his identity and potentially increasing the potential for violence. (See *In re Bennett* (2018) 26 Cal.App.5th 1002, 1025 [when a codefendant knows the planned robbery victim, there is an "increased . . . likelihood that [the codefendant] would be recognized and resort to violence to avoid capture"].) Indeed, Dong readily recognized Nguyen and called out his name during the crime. Considering these facts, we find Johnson made little, if any, effort to minimize potential violence.

Finally, we briefly consider the testimony of Johnson's character witnesses—testimony that Johnson deems significant. As he notes, four defense witnesses testified to his nonviolent character, three prosecution witnesses testified that, before the night of the murders, they had never seen Johnson with a gun, and one of the prosecution witnesses added that Johnson appeared to be "more innocent and less conniving than a lot of people" she had met. This testimony, Johnson asserts, tends to show that he "is unlikely to harbor the 'willingness to kill (or to assist another in killing)' that is encompassed by the 'reckless indifference' required here." Although the Attorney General attempts to discount this testimony altogether, arguing that "no legal authority" exists "to support the consideration of character evidence" in this context, we find the testimony carries some relevance and may be considered. After all, "[w]e analyze the totality of the circumstances to determine whether [a defendant] acted with reckless indifference to human life" (*Scoggins, supra*, 9 Cal.5th at p. 677), and evidence concerning, for example, the defendant's familiarity with weapons, holds some relevance in considering whether the defendant appreciated the risk of the crime.

34

But that said, we find Johnson's offered testimony of only limited help to his position. To start, all of Johnson's character witnesses had, at least to some extent, mistaken perceptions of him. One character witness, for example, when asked whether Johnson sold marijuana, said, "That doesn't sound like him." Another, when asked the same question, said, "I know that in fact marijuana dealing is not [Johnson]." And the two remaining character witnesses expressed similar sentiments, saying they never knew him to be involved with drugs. But Johnson admitted to both using and selling drugs. Moreover, these witnesses' perceptions of Johnson's capacity for violence could not undo the testimony at trial. Although, for example, several witnesses testified that they had not previously seen Johnson with a gun, Johnson admittedly armed himself with a gun during the crime. And although several witnesses testified to Johnson's nonviolent character, Johnson admitted to pistol-whipping Dong. So while, unlike the Attorney General, we find consideration of this testimony appropriate, it cannot erase the other evidence in this case.

Ultimately, considering the totality of the circumstances, we find substantial evidence supports the finding that Johnson acted with reckless indifference to human life. To sum up some of the most salient details, Johnson agreed to carry out a crime—a home invasion of a drug dealer—with obvious risks of lethal violence. He carried a loaded gun and joined another, Nguyen, who also carried a loaded gun. He knew, early on, that Nguyen was capable of needless acts of violence following Nguyen's pistol-whipping of Thanh, who had his hands behind his head at the time, He joined Nguyen in intimating the home's inhabitants, using his gun to guard Thanh while Nguyen searched the rest of the house. He remained with Nguyen even after Nguyen shot Tien. He afterward joined Nguyen in interrogating Dong about the location of his money and then pistol-whipped Dong. And he apparently offered no objections when Nguyen asked for and then took his gun after Nguyen's own gam jammed, which Nguyen then used to shoot Thanh and Dong. Through it all, Johnson remained with Nguyen.

Although we find these facts sufficient to support the jury's verdict, we appreciate that the jury, focusing on a different set of facts, very well could have reached a different verdict. It could, for instance, have given greater weight to the testimony of Johnson and his character witnesses, and then concluded that he lacked the requisite culpability to warrant a felony-murder conviction. But that matters little for our purposes. In reviewing a challenge to the sufficiency of the evidence, our role is to resolve all conflicts in the evidence in favor of the judgment's findings, so long as these findings are based on substantial evidence and not speculation, supposition, or conjecture. (*People v. Lee* (2011) 51 Cal.4th 620, 632; *People v. Davis* (2013) 57 Cal.4th 353, 360.) Performing that limited function here, we are satisfied that substantial evidence supports the jury's verdict. (See *In re McDowell, supra*, 55 Cal.App.5th at pp. 1011-1015; *People v. Law* (2020) 48 Cal.App.5th 811, 825 [finding sufficient evidence supported the felony-murder conviction of a codefendant who helped break "into the victim's house," used a gun "to threaten the victim and his roommates," "watched without intervening when his accomplice pistol whipped the victim once and tried to do it again," and failed to try "to stop his accomplice's violent behavior or to help the victim once he had been shot"; "this sort of conduct easily meets our state's standard for what constitutes being a major participant who acted with reckless indifference to human life"].)[3]

---

[3] At oral argument, Johnson offered one additional ground for countering the finding that he acted with reckless indifference to human life: He was only 21 years old at the time of the crime. In support, he largely relies on two sources: (1) section 3051, which, since 2018, has treated offenders 25 years of age or younger as "youth offenders" who are entitled to enhanced parole opportunities in light of their reduce maturity (Stats. 2017, ch. 675, § 1); and (2) a recent court decision that found the age of a defendant, who was only 16 years old at the time of the crime, was relevant in determining whether he acted with reckless indifference to human life (*In re Moore* (2021) 68 Cal.App.5th 434). But because Johnson offered this argument for the first time at oral argument, without good cause, we find the contention forfeited. (*Kinney v. Vaccari* (1980) 27 Cal.3d 348, 356, fn. 6.) In doing so, we acknowledge that the *Moore* decision is a new one. But we find

36

IV

*Cumulative Error*

Finally, in terms of appellants' arguments, we briefly address Johnson's claim of cumulative error. Johnson contends reversal is warranted because of the cumulatively prejudicial effect of the admission of the unredacted plea agreements and the removal of the juror. But because we find no error in the court's removal of the juror and no prejudicial error in the admission of the plea agreements, we reject the claim.

V

*Error in Abstract of Judgment*

Lastly, we turn to an issue raised by the Attorney General: The abstract of judgment for Nguyen contains a clerical error. Again, as relevant here, the jury found true the allegations that Nguyen, for each murder count, intentionally discharged a firearm causing death. The trial court afterward sentenced Nguyen "to an indeterminate term of 25-years-to-life" for each of these firearm enhancements. The abstract of judgment, however, shows that Nguyen was sentenced to a term of 25 years (rather than 25 years to life) for each firearm enhancement. To address this discrepancy, we will direct the trial court to correct the abstract of judgment to reflect the orally imposed sentence. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 ["Courts may correct clerical errors at any time, and appellate courts (including this one) that have properly assumed jurisdiction of cases have ordered correction of abstracts of judgment that did not accurately reflect the oral judgments of sentencing courts."].)

DISPOSITION

The judgment is affirmed. The trial court is directed to correct the abstract of judgment to reflect the court's orally imposed sentence, as discussed in part V of the

that the principles underlying it are not. (See, e.g., *J.D.B. v. North Carolina* (2011) 564 U.S. 261, 272 [180 L.Ed. 2d 310].) Even the relevant text from section 3051, to emphasize the point, was enacted years before the briefing in this case.

Discussion in our opinion, and then forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

         \s\                  ,
BLEASE, Acting P. J.

We concur:

       \s\         ,
MAURO, J.

       \s\         ,
DUARTE, J.